NUNC PRO TUNC OPINION
{¶ 1} Defendant-appellant, Michael L. Gordon, appeals from the judgment entry of the Franklin County Court of Common Pleas finding him guilty, pursuant to a jury verdict, of felonious assault, involuntary manslaughter, and kidnapping, each with specifications, in violation of R.C. 2903.04, 2903.11 and2905.01. For the reasons that follow, we affirm.
 {¶ 2} According to the evidence at trial, the charges arose from events on the night of April 29, 1997, and continuing into the next morning. Most of the events took place at a house on Heyl Avenue in Columbus, Ohio, which belonged to Aaron Swank. Defendant arrived at the house with Swank and a third man who was not identified. These three men brought with them a fourth man, against his will. Swank held a gun to the man's head as they took him to the basement with his face covered. The third man then left after a few minutes.
 {¶ 3} These events were witnessed by two women in the living room, and by Keaton Payne in the den. Payne went down to the basement where he observed defendant and Swank hitting the man they had forced into the house. Payne participated briefly in the hitting but then left the house.
 {¶ 4} Stephanie Coleman and Dawn Barrowman, who were still upstairs, heard screams coming from the basement. They heard screams intermittently over a long period but eventually fell asleep. Coleman testified that the next morning, defendant woke her up and asked her to come downstairs and help clean up blood, but she refused. Barrowman testified that defendant told her that they had beaten the man, thrown his body into the trash, and killed him.
 {¶ 5} On April 30, 1997, a sanitation worker picked up trash from dumpsters in an area including Heyl Avenue and the alley behind it, and dumped the trash at a facility on Jackson Pike. As the truck was dumping its contents, a worker saw a body in the trash. The dead body was later identified as Daniel Cole, who had been shot once in the head.
More than a year later, police discovered evidence linking Michael Gordon and Aaron Swank to Cole's death. Defendant was indicted on counts of murder, involuntary manslaughter, felonious assault, and kidnapping. The court appointed counsel to represent defendant, and the trial began in July 2002. However, a mistrial was declared when defendant's counsel responded to his client's criticisms by hitting him.
 {¶ 6} Before the second trial, the court appointed Terry Sherman to serve as counsel for defendant. Prior to trial, Sherman received permission to have Matt Zeiger assist him in the defense, and the trial began on February 11, 2003. Defendant was deemed to be a high-risk prisoner based on reports of altercations from jail officials and federal marshals, and he was therefore placed in leg shackles, with four deputy sheriffs on duty in the courtroom during defendant's appearances. In addition, a stun belt was placed around defendant's waist in lieu of fastening his shackles to the table.
 {¶ 7} During the trial, defendant frequently spoke up and addressed the court directly. At one point, defendant expressed the belief that Zeiger was causing a lack of communication between him and his attorney. Defendant said he felt his attorney was spending too much time talking with Zeiger, who was not experienced in trial practice. Defendant commented that it would be better to be pro se than to have Zeiger in between him and his attorney. Defendant was also upset at Sherman, who had "shushed" him during a witness's examination.
 {¶ 8} Sherman stated that he had not previously been made aware of any problem and that he believed the problem was that Zeiger was sitting in between him and defendant. He stated that he would change the seating arrangement so that his client was sitting next to him, and he provided writing materials so that his client could write down any questions he had during witnesses' examinations. Sherman asserted that Zeiger had done an excellent job on the opening statement, and the court commented that having Zeiger as an assistant was benefiting defendant rather than impeding his defense. Nonetheless, defendant insisted that Zieger be taken off the case. Sherman then agreed that he would do all the witness examinations himself. The court denied leave for defendant to represent himself.
 {¶ 9} Defendant objected to the court's ruling, but the court explained the reasons for denying defendant's request to begin representing himself at that point in the proceedings, finding it improper under the circumstances to approve a waiver of counsel after the jury had been impaneled and defendant had been placed in jeopardy. Given that the theme of the case had been established by defense counsel in the opening statement and that witnesses had already been examined by counsel, the court found a significant risk that jurors would make negative interpretations regarding counsel's withdrawal. The court further found there was no way to avoid that risk. The court concluded that a modification in the representation scheme would impair the fairness and impartiality of the trial. Moreover, the court lacked confidence in defendant's ability to adhere to the protocol, decorum, and rulings of the court that would be necessary to have an orderly trial.
 {¶ 10} The trial proceeded; however, after one recess, defendant refused to leave his cell adjacent to the courtroom. Sherman reported that defendant had expressed a desire to discharge him as counsel. The court held a hearing in the cell, and the defendant stated his reasons for refusing to enter the courtroom. The court explained that the courtroom was not equipped to transmit video or audio into the cell, and that to leave the door open between the courtroom and the cell could cause prejudice because the jury would observe that defendant was not merely absent but incarcerated. Defendant made a number of demands, including that he wanted to represent himself.
 {¶ 11} The court explained that his right to represent himself had changed significantly after the trial commenced. The court found that a "change in midstream * * * would be directly adverse to your interests in that the jury is going to wonder why that counsel are no longer with you during the trial." (Tr. 332.) Further, the court expressed concern that, because the trial was already in progress with a jury waiting to return from recess, defendant would not have sufficient time for adequate preparation, which would prejudice him. The court observed that a pro se defendant could intentionally create a situation that would result in a mistrial, and the court did not want to run that risk.
 {¶ 12} Defendant next asserted that his attorney had not done everything he was asked to do in preparing the defense. After additional discussion, defendant indicated that what he really wanted was to keep Zeiger out of the trial rather than proceed with no counsel at all:
That right there is leaving open the door for [Zeiger] to step in here. And that is the sole reason that I wanted to go pro se in the first place.
(Tr. 337.)
 {¶ 13} Defendant complained that Sherman was giving more attention to Zeiger's instruction than to consulting with defendant during trial and that Sherman was not asking questions that defendant wanted to have asked. The court instructed defendant to write down the questions that were not being asked so that the questions could be placed in the record. The defendant agreed to enter the courtroom but did not waive his objection to proceeding with counsel.
 {¶ 14} During the hearing, defense counsel responded to defendant's allegations, explaining among other things that he had subpoenaed every witness that defendant asked for, but that 90 percent of them had expressed hatred toward defendant, indicating that they wanted him to die. Sherman stated that there were two favorable witnesses, who would be called. He also noted that Zeiger was providing assistance without compensation. Finally, Sherman informed the court that defendant was simply trying to obtain another mistrial. However, Sherman indicated that this observation would not interfere with his representation of defendant and that he would continue to represent defendant with zeal and passion.
 {¶ 15} The trial proceeded, with Sherman serving as defense counsel. The jury ultimately found defendant guilty of felonious assault, involuntary manslaughter, and kidnapping, with specifications. Pursuant to a February 25, 2003 judgment entry, defendant was convicted of those offenses and sentenced. This appeal followed, in which defendant assigns two errors:
I. The trial court violated appellant's rights under thesixth amendment to the united states constitution and article one, section ten of the ohio constitution by denying his motion to represent himself Pro se at trial.
II. The trial court erred and deprived appellant of due process of law as guaranteed by the fourteenth amendment to the united states constitution and article one section ten of the ohio constitution by finding appellant guilty of involuntary manslaughter, felonious assault and kidnapping as those verdicts were not supported by sufficient evidence and were also against the manifest weight of the evdience.
 {¶ 16} We address the second assignment of error first. With respect to the sufficiency of the evidence, the question is whether the evidence was legally sufficient to support a jury verdict as a matter of law. State v. Thompkins (1997),78 Ohio St.3d 380, 386. The "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia
(1979), 443 U.S. 307, 319, 99 S.Ct. 2781; State v. Williams,99 Ohio St.3d 493, 501, 2003-Ohio-4396. A sufficiency analysis does not permit an appellate court to weigh the evidence, since the weight and credibility of evidence are questions for the finder of fact. State v. Hill (1996), 75 Ohio St.3d 195, 205.
 {¶ 17} During the trial, Richard Stolzenburg described how he and Cole were leaving a bar when Joe Platt approached Cole angrily and demanded that Cole leave with him. According to Stolzenburg, Cole had stolen drugs from Platt repeatedly.
 {¶ 18} Stephanie Coleman, who was in the Heyl Avenue house when defendant arrived, described how defendant entered the house with Swank and another man, forcing a skinny white guy into the basement with a gun to his head. Coleman was acquainted with defendant and identified him positively as one of the group. As to the man being forced into the house, she had a brief glimpse of his head before it was covered, and she testified that the victim had the same color and style of hair as Daniel Cole had in a photograph shown to her. Coleman described the screams coming from the basement and further testified that she was awakened the next morning by defendant, who asked her to clean up blood downstairs, which she refused to do. (Tr. 269.) Coleman heard defendant say that, when he hit the victim, the screams were louder than when Swank kicked him.
 {¶ 19} Keaton Payne was also in the house when defendant arrived. Payne testified that he heard a commotion and saw Swank and others going into the basement. Payne was acquainted with defendant and identified him positively. He went to the basement and saw defendant and Swank hitting a smaller white man. He saw no one else in the basement. Payne testified that he joined in the beating for a short time but became scared and left. When shown a photo of Daniel Cole, Payne stated that he could not testify that Cole was the man being beaten in the basement but that they had the same hair color, hair length and style. Payne testified, however, that he did not get a good look at the victim's face in the basement.
 {¶ 20} Dawn Barrowman, who was in the room with Stephanie Coleman, testified that she witnessed a group of men come into the house, surrounding another person whose face was covered. She identified defendant as a friend since her childhood. She saw two people leave — Payne and one of the men in the group that had entered previously. She heard screams from time to time over a long period. Barrowman testified that in the morning, defendant first asked for Coleman's help in cleaning up blood and then asked Barrowman to help, but she also refused. Swank then drove Barrowman, Coleman, and defendant in his car to a medical building where Barrowman had an early appointment. Barrowman stated that in a conversation that morning, defendant and Swank told her that they had beaten the man, thrown his body into the trash, and killed him. She testified that Swank had threatened to hurt her and her family if she told anyone about the incident.
 {¶ 21} William Stierhoff, an employee of Swank's, testified that he was often at the Heyl Avenue house in April 1997 through July 1997 helping to care for Swank's 22 dogs, including numerous pit bulls, rottweilers, and dobermans. Stierhoff knew defendant as a friend and was also acquainted with Joe Platt as Swank's friend and a frequenter of his house on Heyl.
 {¶ 22} Stierhoff testified that he was at Swank's house one day when defendant was acting very upset. Among other topics that were discussed, defendant told Stierhoff how he and Swank had been hitting someone when Swank went further than defendant wanted to go. According to Stierhoff, defendant said they planned to beat the guy up, which they did, but then they threw the guy into a dumpster because they did not know what to do with him, and they shot him. According to Stierhoff's testimony, defendant said that Swank wanted him to shoot the guy but he did not want to, so Swank grabbed defendant's hand and put the gun in it and pulled the trigger with both of their hands on the gun. Stierhoff further described how, during his conversation with defendant, Swank came in and tried to prevent defendant from talking about the incident.
 {¶ 23} Viewing the evidence in favor of the prosecution, we conclude that the evidence was sufficient for a rational jury to find defendant guilty of kidnapping, felonious assault, and involuntary manslaughter as specified. There was both direct and circumstantial evidence to establish that defendant helped to bring Cole to the house against his will and participated in Cole's beating and death. Indeed, defendant had confessed his involvement to Stierhoff. Although Payne, Coleman, and Barrowman did not positively identify Daniel Cole as the man forced into the basement, they testified that the victim they observed had the same body type as Cole and hair of the same color, length and style. There was evidence that the victim at the Heyl Avenue house was beaten and shot once, which was consistent with the condition of the dead body. Cole had been approached on the night in question by an angry man who was a friend of Swank's and who had a strong reason to punish Cole. The evidence was sufficient to establish that the man beaten at the Heyl Avenue house and shot was the same man whose dead body was picked up with trash on April 30, 1997 by the sanitation worker whose area included Heyl Avenue. In light of the direct and circumstantial evidence presented by the state, we find sufficient evidence from which a rational trier of fact could infer and conclude beyond a reasonable doubt that defendant committed the offenses of which he was found guilty.
 {¶ 24} With respect to the manifest weight of the evidence, an appellate court reviews the entire record, considers the credibility of witnesses, weighs the evidence and all reasonable inferences, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Otten (1986),33 Ohio App.3d 339, 340 In Thompkins, the court explained that when a court of appeals reverses a trial judgment on the grounds that the verdict was against the weight of the evidence, the appellate court performs the same task as a juror and "disagrees with fact finder's resolution of conflicting testimony." Id. at 387. Nevertheless, the court must be mindful that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967),10 Ohio St.2d 230.
 {¶ 25} In the present action, defendant argues that not only was the state's evidence circumstantial, but that testimony of key witnesses was substantially discredited. In particular, defendant emphasizes that key witnesses gave testimony inconsistent with their prior statements. Further, the defense established at trial that Payne, Coleman and Barrowman were under the influence of alcohol and drugs during the period of their alleged observations. Defendant also points to the fact that the witnesses' stories were inconsistent among themselves in several respects, and that witnesses initially lied to the police when questioned. Defendant also notes that by the time the case was tried, six years had elapsed since the events, and that the witnesses' memories were further clouded by the passage of time. In addition, defendant emphasizes that no forensic evidence linked him to the crime scene or the dead body.
 {¶ 26} Having examined the entire record and trial transcript, we cannot conclude that the jury lost its way, resulting in a miscarriage of justice. Despite the strong defense presented during the trial, we conclude that the state presented probative and persuasive evidence of guilt. Although the defense vigorously attacked the credibility of witnesses, the jury was free to believe all, part, or none of the testimony of each of the witnesses who appeared before them. State v. Burke,
Franklin App. No. 02AP-1238, 2003-Ohio-2889, at ¶ 15. Based on the record, we cannot conclude that "the evidence weighs heavily against the conviction." Thompkins, at 387. The second assignment of error is not well taken and is overruled.
 {¶ 27} In his first assignment of error, defendant contends that the trial court committed reversible error when it refused to permit him to discharge counsel and proceed pro se after the trial had begun. With respect to this argument, defendant asks the court to reverse his conviction and remand this matter to the trial court for further proceedings or other relief as appropriate.
 {¶ 28} Defendant relies on Faretta v. California (1975),422 U.S. 806, 99 S.Ct. 2525 in which the United States Supreme Court held that a criminal defendant has a constitutional right to self-representation. Where a trial court denies a request for self-representation "when properly invoked," the denial is reversible error per se, not subject to a harmless-error analysis. E.g., State v. Vrabel, 99 Ohio St.3d 184, 193,2003-Ohio-3193; see, also, State v. Reed (1996),74 Ohio St.3d 534.
 {¶ 29} However, the right is not absolute, and a request for self-representation must be timely and unequivocal. E.g.,Vrabel, at 194 (holding that "the trial court did not abuse its discretion and properly refused appellant's request to represent himself after voir dire had been completed and on the first day that evidence was to be presented"); State v. Cassano,96 Ohio St.3d 94, 2002-Ohio-3751, at ¶ 38-41 (noting that a request to exercise the right of self-representation must be timely and unequivocally asserted); United States ex rel. Maldonado v.Denno (C.A.N.Y. 1965), 348 F.2d 12, 15 (observing that, once a criminal trial has started with defendant represented by counsel, his right to discharge his lawyer and proceed pro se is sharply curtailed), certiorari denied (1966), 384 U.S. 1007,86 S.Ct. 1950; United States v. Martin (C.A. 6, 1994), 25 F.3d 293, 296
(reiterating that, even where the right to self-representation is clearly invoked, it must be done so in a timely manner, and courts will balance defendant's assertion against considerations of judicial delay).
 {¶ 30} On appeal, where a criminal defendant challenges the denial of a tardy request for self-representation, the court reviews the trial court's ruling under the standard for abuse of discretion. Vrabel, supra; Robards v. Rees (C.A. 6, 1986),789 F.2d 379; State v. Reed (Nov. 6, 1996), Hamilton App. No. C-940315 (citing numerous authorities for the proposition that, after a trial has begun, the decision whether to grant a request for self-representation is a matter for the trial court's discretion) (referred to infra as "Reed II").
 {¶ 31} When the trial court determines whether to grant a request to proceed pro se that is made after the commencement of trial, the trial court must balance defendant's interest in self-representation against the potential disruption of the proceedings already in progress. E.g., Martin, supra; United States v. Noah (C.A. 1, 1997), 130 F.3d 490, 498. Courts consider factors such as the quality of current counsel's representation, whether defendant genuinely wished to conduct his own defense or was engaging in a tactic to delay the trial, whether permitting self-representation would unduly delay the proceedings, whether defendant expressed dissatisfaction with counsel's performance prior to making the request for self-representation, whether previous delays occurred or a prior mistrial was involved, and the proclivity of defendant to change attorneys. See, e.g., Robards, at 383 (finding no abuse of discretion where defendant did not make his request for self-representation until after the roll of jurors had been called, did not express any displeasure with the quality of his attorney's performance until the day of trial, and did not demonstrate a genuine inclination to conduct his own defense or the ability to do so); Reed II, supra (concluding that trial court did not abuse its discretion in denying self-representation where request was made after the jury heard the prosecution's opening statement, and the absence of counsel after the recess would have been disruptive and prejudicial to defendant); United States v. Brown (C.A.N.Y. 1984), 744 F.2d 905 (concluding that trial court was well within its discretion to deny defendant's mid-trial request to proceed pro se, where defense counsel corrected the only colorable criticism of his performance, and reasonably concluded not only that his representation by counsel was adequate but also that defendant's representation of himself would have been disruptive of the trial process), certiorari denied, 469 U.S. 1089,105 S.Ct. 599; Tuitt v. Fair (C.A. 1, 1987), 822 F.2d 166, 169
(upholding denial of request for self-representation where the request was made on the day of trial and it was the first time that defendant gave his attorney any notice of dissatisfaction), certiorari denied, 484 U.S. 945, 108 S.Ct. 333; Horton v. Dugger (C.A. 11, 1990), 895 F.2d 714 (denying defendant's request made 18 minutes before start of rescheduled trial); Mackovich v. United States (C.A. 10, 2000), 209 F.3d 1227 (upholding denial of self-representation where request was based in part on frivolous complaints about counsel's performance, defendant had used counsel's assistance for seven months before trial and defendant had appeared in court with his attorney on multiple occasions, obtained prior continuances, the change to self-representation was requested only six to ten days before trial, and defendant threatened to "stand mute" and withhold his participation when the trial court denied his request, all of which indicated that the request was made to delay the trial and abuse the judicial process), cited with approval in Vrabel, supra; United States v. Betancourt-Arretuche (C.A. 1, 1991), 933 F.2d 89 (upholding denial of Faretta request made after the jury was selected and sworn in for defendant's second trial, and noting that defendant had ample time and knowledge of the circumstances to make a request to represent himself at some earlier point), certiorari denied,502 U.S. 959, 112 S.Ct. 421; State v. Bentley (Oct. 30, 2000), Stark App. No. 2000CA00147 (holding that trial court's summary denial of request to proceed pro se, made just prior to opening statement was not an abuse of discretion because granting the request would have impermissibly delayed the commencement of trial, and the jury would have been left to speculate as to why defendant was no longer represented by counsel, causing prejudice to defendant). See, also, McDonald v. State (Lorain C.P. 1991),62 Ohio Misc.2d 262 (citing cases from other jurisdictions regarding requests to proceed pro se after the trial has begun); Lester v. Jabe (C.A. 6, 1994), 23 F.3d 407 (where defendant did not assert desire for self-representation until after jury selection and where trial court addressed stated complaints about counsel's performance, trial court did not abuse discretion in denying request for self-representation).
 {¶ 32} In the present case, defendant did not seek to represent himself until after two witnesses had been examined. He expressed no displeasure with counsel's performance, and gave no indication of a desire to proceed pro se until after the jury had heard opening statements and testimony of witnesses. Defense counsel stated that he had not previously been made aware of any dissatisfaction on his client's part, and defendant did not contradict that statement. Counsel took immediate steps to remedy his client's stated concerns with respect to seating arrangements and use of co-counsel, and also made provisions for claimant to write down any questions he wanted to have asked. Further, counsel set forth a reasonable explanation as to why he was not calling more witnesses for the defense. The trial court addressed defendant's stated concern regarding questions that he wanted to have asked, and defendant does not cite in his appellate brief any omitted question with respect to counsel's performance at trial. Indeed, the record does not reflect any deficiency in performance of trial counsel that might support a genuine reason to discharge trial counsel. The trial court repeatedly expressed concern that a midstream change would cause material prejudice due to the jury's reaction to a sudden lack of counsel's participation. Further, the examination of witnesses was already in progress and the court found that there was insufficient time for defendant to prepare for the remaining witnesses. In addition, the court did not believe that defendant would be able to comply with the procedures and protocols necessary for an orderly trial. Further, the court did not want to run the risk of a mistrial. In light of the fact that the first trial had ended in a mistrial, the court's concern was reasonable. Moreover, the trial judge repeatedly permitted defendant to address the court directly, rather than instructing defendant that he could speak only through counsel. Cf. Robards, supra. Given all the circumstances reflected in the record, we conclude that the trial court was within its discretion to deny defendant's mid-trial request to represent himself. The first assignment of error is overruled.
 {¶ 33} Having overruled both assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Klatt and Sadler, JJ., concur.