[Cite as *State v. Barron*, 2024-Ohio-5836.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2023-CA-70 |
| | : | |
| v. | : | Trial Court Case No. 2023 CR 0148 |
| | : | |
| CHRISTOPHER BARRON | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on December 13, 2024

. . . . . . . . . . .

ROBERT ALAN BRENNER, Attorney for Appellant

MEGAN A. HAMMOND, Attorney for Appellee

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant, Christopher Barron, appeals from his convictions in the Greene County Court of Common Pleas after a jury found him guilty of single counts of felonious assault, domestic violence, and abduction. In support of his appeal, Barron contends

that his convictions should be reversed because the trial court violated his right of self-representation by denying his mid-trial request to dismiss his counsel and proceed pro se. Barron also contends that the trial court erred by failing to merge all of his offenses as allied offenses of similar import at sentencing. In addition, Barron contends that his conviction for abduction was not supported by sufficient evidence and that all of his convictions were against the manifest weight of the evidence. Lastly, Barron contends that his trial counsel provided ineffective assistance by failing to subpoena certain witnesses at trial. For the reasons outlined below, the judgment of the trial court will be affirmed.

### Facts and Course of Proceedings

{¶ 2} On March 10, 2023, a Greene County grand jury returned a four-count indictment charging Barron with felonious assault (serious physical harm), felonious assault (deadly weapon), domestic violence, and abduction. The charges stemmed from an alleged physical altercation between Barron and his wife ("the victim") at a residence in Fairborn, Ohio. Barron, who was represented by counsel, appeared at his arraignment hearing and pled not guilty to the indicted charges. The matter thereafter proceeded to a three-day jury trial.

{¶ 3} During trial, the State presented testimony from the victim, a domestic violence expert, and three investigating officers from the Fairborn Police Department. In his defense, Barron presented testimony from a paramour of the victim and also testified on his own behalf. On the first day of trial, the State presented testimony from its first

two witnesses, i.e., the victim and the domestic violence expert. At the beginning of the second day of trial, Barron requested that the trial court dismiss his counsel and allow him to proceed pro se for the rest of trial. In support of his request for self-representation, Barron argued that his trial counsel was not adequately representing him because counsel had failed to subpoena certain witnesses who Barron believed were critical to his defense.

{¶ 4} After giving Barron time to speak privately with his counsel and the standby counsel who would be assisting him if he were allowed to proceed pro se, the trial court began questioning Barron to ensure that he was knowingly, intelligently, and voluntarily waiving his right to counsel. During this questioning, Barron expressed some confusion about his ability to subpoena his witnesses and his ability to challenge his counsel's representation. In light of Barron's confusion and his continued questions on those topics, the trial court ceased questioning Barron and ultimately decided to deny Barron's request for self-representation. Thereafter, Barron's trial moved forward with Barron being represented by counsel.

{¶ 5} The following is a summary of the testimony that was elicited at trial.

*Victim's Testimony*

{¶ 6} The victim testified that she and Barron had been married for five years and that in March 2023, they had been living together in a single-family home that was owned by her mother. With regard to the incident in question, the victim testified that on March 2, 2023, she was sleeping on the living room couch when she awoke to Barron lying on

her chest. At first, Barron was being nice and was in a good mood, but that suddenly changed when Barron stood up and started yelling at the victim. The victim stood up in response, and Barron grabbed the victim and pushed her against a utility closet door, which broke, causing the victim to fall backward. Thereafter, Barron grabbed the victim and pushed her into a bedroom. While the victim was on the bed, Barron pulled out a kitchen knife with a six-to-eight-inch-long blade and jabbed the knife toward the victim's stomach area two or three times. The victim grabbed the end of the knife to stop Barron from jabbing it at her, which resulted in a cut on the victim's finger. Barron then stuck the knife into the bedroom wall.

{¶ 7} After Barron stuck the knife into the wall, he put one hand on the victim's chest and used his other hand to grab the top of the victim's ponytail. Barron then pulled on the victim's ponytail until the victim's neck popped, which left her with no feeling in the back of her head. The victim, who had been on the bed, then backed up against the wall. While she was against the wall, Barron struck the victim on the head a couple of times with the victim's cellphone. The victim testified that Barron smacked the cellphone against her head so hard that the screen went out of the cellphone.

{¶ 8} After Barron hit the victim with her cellphone, Barron began choking the victim by placing his hands on each side of her neck. While Barron was choking her, the victim grabbed a hold of Barron's hands and used her hips to make him lose his balance. After Barron lost his balance, the victim tried to get past him, but Barron grabbed the victim again and put her in a headlock that was so tight the victim could not breathe. While in the headlock, the victim used her feet to kick off the wall, which caused Barron

to lose his balance and fall backward. After Barron fell backward, both Barron and the victim slid down to the floor. Once they were on the floor, the fighting stopped. The only statement the victim remembered making during the incident was "you're going to kill me," and Barron responded "yeah, I'm going to kill you." Trial Tr., p. 63.

{¶ 9} After the fighting stopped, Barron started crying, and the victim went into the living room to get tobacco so she could roll a cigarette, which she smoked in the bedroom with Barron. The victim then walked with Barron to his grandmother's house. When they arrived at Barron's grandmother's house, Barron told the victim to keep her hood up to hide her face. After spending some time with Barron's grandmother, Barron's grandmother paid to have an Uber driver take Barron and the victim back home. After the victim and Barron were at home, the victim's grandmother arrived an hour later and took the victim to her residence, where the victim eventually met up with her sister. The victim told her sister about the physical altercation with Barron, and the sister encouraged the victim to go to the hospital for medical assistance.

{¶ 10} The victim testified that she went to the hospital the same day as the altercation with Barron because she and her sister were concerned about her temples being sore and swollen. The victim identified photographs of her injuries as they existed at the hospital. The photographs showed the victim in a neck brace with two black eyes, a swollen face, bruising on her elbow and forearm, a red abrasion in the area of her hairline, and a cut on her finger. *See* State's Ex. 1-9.

*Law Enforcement's Testimony*

{¶ 11} The testimony from the three investigating law enforcement officers established that an officer made contact with the victim at the hospital and observed and photographed all of the victim's aforementioned injuries. The day after the incident, officers went to the victim and Barron's residence to serve an arrest warrant on Barron and to execute a search warrant for the residence. While searching the residence, an officer observed a kitchen knife stuck in the bedroom wall. When the officer removed the knife from the wall, he observed some blood on the knife's blade. Photographs of the knife and the blood were admitted into evidence as State's exhibits 10-14. The investigating detective assigned to the case testified that officers did not attempt to collect fingerprints from the knife, but that the knife was sent out for DNA testing. The detective confirmed that said testing established that the victim's blood was present on the knife's blade.

{¶ 12} The investigating detective also testified that he interviewed the victim the day after the incident. At that time, the detective observed the injuries to the victim's face and head and noticed that the victim was in pain and could not move her neck. The detective testified that he collected the victim's cellphone and observed that the cellphone had been damaged. A photograph of the damaged cellphone was admitted into evidence as State's exhibit 15. The photograph showed that the cellphone's screen was detached from the rest of the cellphone.

*Domestic Violence Expert's Testimony*

{¶ 13} The domestic violence expert testified that she had not personally been

involved with the victim's case. The expert, however, provided the jury with general information about domestic violence survivors. Among the information provided by the expert was that every survivor responds differently to domestic violence and that "[t]here's not any one way that a survivor's always going to respond." Trial Tr., p. 27. More specifically, the expert testified that victims are "not always sure exactly what to do" and that "they may report right away; or they may think about it." *Id.* at 26.

*Paramour's Testimony*

{¶ 14} A short-term paramour of the victim testified to meeting the victim for the first time at a friend's party on the last day of February 2023. The paramour testified that the victim had called him the day after they met and asked him to pick her up in Bellbrook, Ohio, because she had been in a car accident. The paramour testified that when he picked the victim up, she had the same injuries that were shown in the State's photographic evidence. In other words, the paramour's testimony indicated that the victim had the injuries in question on March 1, 2023, i.e., the day before the alleged altercation with Barron.

{¶ 15} On cross-examination, the paramour admitted to having been recently convicted for possession of fentanyl. The paramour also admitted that he had never mentioned the victim's injuries to anyone prior to trial. Rebuttal testimony from the investigating detective also indicated that there was no crash report or other record in the State of Ohio's crash-report system indicating that the victim was involved in a car accident either as driver or passenger during the time period in question.

*Barron's Testimony*

**{¶ 16}** Barron testified that his marriage with the victim had been "kind of bumpy" in the months leading up to the alleged March 2, 2023 physical altercation. Trial Tr., p. 237. Barron testified that he and the victim had been living in the same house, but that they had been talking about becoming legally separated and that the victim had been seeing "a couple of different guys." *Id.* According to Barron, the victim had been staying at a friend's house during the days leading up to the alleged altercation and had not taken her cellphone with her. Barron testified that he had gone to where the victim was staying to tell her that her family was looking for her. Barron claimed that he and the victim thereafter walked back to their residence and that he gave the victim her cellphone. Barron testified that the victim later told him that she had dropped her cellphone, and that the cellphone had been damaged prior to March 2, 2023.

**{¶ 17}** Continuing, Barron testified that sometime prior to March 2, 2023, the victim showed up at their residence with a minor black eye and then left for a few days. Barron testified that the victim later returned to their residence on the morning of March 2, 2023, with the severe injuries shown in the State's photographic evidence. Barron testified that the victim had told him that she was in a car accident. Barron claimed that he helped clean the victim up and that he and the victim thereafter walked to his grandmother's house. From his grandmother's house, Barron claimed that he and the victim took an Uber back home. According to Barron, the victim thereafter went to get a cigarette but never returned. Barron denied having any physical altercation with the victim on March

2, 2023.

{¶ 18} During his testimony, Barron expressed his belief that the victim was blaming him for her injuries as a way to force him to leave their residence. Barron claimed that the victim's family wanted him to leave the residence since the residence was owned by the victim's mother. He also claimed that the victim's friends may have put the victim up to lying about his assaulting her because the friends were getting evicted and needed a place to stay.

{¶ 19} Although Barron denied getting into a physical altercation with the victim, on cross-examination, he admitted that when the investigating detective asked him why he believed the police were present at his residence, Barron responded: "A fight with my wife." Trial Tr., p. 263. Barron also admitted to telling the detective that he agreed it looked like someone had beaten the victim up as opposed to the victim's being in car accident. Barron specifically testified that "it looked like she got beat up" and that he "thought the guy she was with had beaten her up." *Id.* at 274 and 276. Barron also admitted that the victim did not have a car during the time period in question. Moreover, Barron admitted that he and the victim had been alone together in their residence between 6:00 a.m. and 8:30 a.m. on March 2, 2023.

*Verdict and Sentencing*

{¶ 20} After considering the testimony and exhibits presented at trial, the jury found Barron not guilty of felonious assault (serious physical harm), but it found him guilty of felonious assault (deadly weapon) in violation of R.C. 2903.11(A)(2), domestic violence

in violation of R.C. 2919.25(A), and abduction in violation of R.C. 2905.02(A)(2).

{¶ 21} Prior to sentencing, Barron argued that all of his offenses were allied offenses of similar import that should merged into one conviction for sentencing. The trial court disagreed and declined to merge any of Barron's offenses. Thereafter, the trial court imposed a mandatory, indefinite term of 8 to 12 years in prison for felonious assault, a definite term of 18 months in prison for domestic violence, and a definite term of 18 months in prison for abduction. The trial court ordered all of Barron's sentences to be served consecutively, for an aggregate term of 11 to 15 years in prison.

{¶ 22} Barron now appeals from his convictions, raising five assignments of error for review.

## First Assignment of Error

{¶ 23} Under his first assignment of error, Barron contends that the trial court erred by denying his midtrial request to waive his right to counsel and represent himself at trial. We disagree.

### Standard of Review

{¶ 24} Appellate courts review a trial court's denial of a defendant's request for self-representation for an abuse of discretion when, as here, the request is asserted after the commencement of trial. *State v. Graham*, 2023-Ohio-2728, ¶ 53 (11th Dist.); *State v. Lavette*, 2019-Ohio-145, ¶ 30 (8th Dist.); *State v. Gordon*, 2004-Ohio-2644, ¶ 30 (10th Dist.), citing *State v. Vrabel*, 2003-Ohio-3193. "A trial court abuses its discretion when it

makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 2013-Ohio-966, ¶ 34. "An abuse of discretion most often involves an unreasonable decision that is not supported by a sound reasoning process." *State v. McHenry*, 2021-Ohio-3118, ¶ 16 (2d Dist.), citing *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). "Abuse-of-discretion review is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court." *Darmond* at ¶ 34, citing *State v. Morris*, 2012-Ohio-2407, ¶ 14.

### *Right of Self-Representation*

{¶ 25} The Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution guarantee a criminal defendant the right to counsel. Implicit within the right to counsel is a " ' "correlative right to dispense with a lawyer's help." ' " *State v. Obermiller*, 2016-Ohio-1594, ¶ 26, quoting *State v. Martin*, 2004-Ohio-5471, ¶ 23, quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942). Accordingly, "a defendant in a state criminal trial has an independent constitutional right of self-representation and . . . he may proceed to defend himself without counsel when he voluntarily, and knowingly and intelligently elects to do so." *State v. Gibson*, 45 Ohio St.2d 366 (1976), paragraph one of the syllabus, citing *Faretta v. California*, 422 U.S. 806 (1975); *accord State v. Neyland*, 2014-Ohio-1914, ¶ 71. "If a trial court denies the right to self-representation when the right has been properly invoked, the denial is per se reversible error." *Neyland* at ¶ 71, citing *State v. Reed*, 74 Ohio St.3d 534, 535 (1996),

citing *McKaskle v. Wiggins*, 465 U.S. 168, 177, fn. 8 (1984).

{¶ 26} "Courts are to indulge every reasonable presumption against the waiver of a fundamental constitutional right including the right to be represented by counsel." (Citations omitted.) *State v. Dyer*, 117 Ohio App.3d 92, 95 (2d Dist.1996). "Although a defendant's waiver of his right to counsel and decision to invoke his right of self-representation are afforded tremendous respect and deference, the right of self-representation is not absolute, and it is subject to some limitation on its invocation and exercise." *State v. Godley*, 2018-Ohio-4253, ¶ 13 (3d Dist.), citing *State v. Buchanan*, 2017-Ohio-1361, ¶ 12 (8th Dist.), citing *Indiana v. Edwards*, 554 U.S. 164 (2008). For example, "[t]o be properly invoked, a pro se request must be unequivocal and timely; otherwise, the trial court may, in its discretion, deny the request." *State v. Halder*, 2007-Ohio-5940, ¶ 50 (8th Dist.); *see also State v. Cassano*, 2002-Ohio-3751, ¶ 38 (" 'The constitutional right of self-representation is waived if it is not timely and unequivocally asserted.' "), quoting *Jackson v. Ylst*, 921 F.2d 882, 888. (9th Cir. 1990).

{¶ 27} The Supreme Court of Ohio has made it clear that "[a] trial court may deny a defendant's request for self-representation if it is untimely made." *Neyland* at ¶ 76. Thus, "a trial court may predicate 'its decision solely on the timing of appellant's request.' " *State v. Degenero*, 2016-Ohio-8514, ¶ 14 (11th Dist.), quoting *State v. Deir*, 2006-Ohio-6885, ¶ 34 (11th Dist.); *accord State v. Frost*, 2019-Ohio-3540, ¶ 28 (12th Dist.). Moreover, a trial court does not need to determine a defendant's competency to represent himself or herself when the underlying request is untimely. *Neyland* at ¶ 79.

{¶ 28} Ohio case law indicates that a defendant's request for self-representation is

untimely if it is made after the commencement of trial. *See, e.g., Vrabel*, 2003-Ohio-3193, at ¶ 53 (request for self-representation untimely where it was made after voir dire had been completed and on the first day evidence was to be presented); *Neyland*, 2014-Ohio-1914, at ¶ 77 (request for self-representation untimely where it was made just before the beginning of the trial-phase closing arguments); *State v. Eggeman*, 2015-Ohio-5177, ¶ 36 (9th Dist.) (request for self-representation untimely where it was made "mid-trial"); *State v. Beamon*, 2019-Ohio-443, ¶ 16 (12th Dist.) (request for self-representation was untimely where it was made on the second day of trial after the State had nearly completed its case-in-chief); *State v. Hrytsyak*, 2020-Ohio-920, ¶ 104-108 (8th Dist.) (request for self-representation was untimely where it was made in the middle of trial, after the State had rested, and before defendant intended to testify on his own behalf); *State v. Kramer*, 2016-Ohio-2984, ¶ 13 (3d Dist.) (request for self-representation was untimely where it was made on the second day of trial); *State v. Steele*, 2003-Ohio-7103, ¶ 20 (1st Dist.) ("last-minute request on the day of trial was not timely made"); *State v. Montgomery*, 2008-Ohio-6077, ¶ 59 (5th Dist.) ("because the request was made after the presentation of three witnesses, the self-representation request was untimely"). Indeed, "it is reasonable, and entirely compatible with the defendant's constitutional rights, to require that the right of self-representation be asserted at some time 'before meaningful trial proceedings have commenced,' and that thereafter its exercise rests within the sound discretion of the trial court." *United States v. Lawrence*, 605 F.2d 1321, 1325 (4th Cir. 1979), quoting *Chapman v. United States*, 553 F.2d 886, 895 (5th Cir. 1977).

**{¶ 29}** If a trial court decides to entertain a defendant's untimely request for self-

representation, in exercising its discretion, "the court should consider the reasons given for the request, the quality of the present attorney's representation, and the defendant's prior proclivity to substitute counsel." *State v. Tucker*, 2003-Ohio-6056, ¶ 16 (1st Dist.), quoting *State v. Reed*, 1996 WL 637830, *2 (1st Dist. Nov. 6, 1996), citing *United States v. Matsushita*, 794 F.2d 46, 51 (2d Cir. 1986); *accord State v. Hardman*, 2016-Ohio-498, ¶ 19 (8th Dist.). In addition, "the trial court must balance defendant's interest in self-representation against the potential disruption of the proceedings already in progress." (Citations omitted.) *Gordon*, 2004-Ohio-2644, at ¶ 31 (10th Dist.). "During trial, the trial court has a greater duty to maintain the integrity of the proceedings." (Citation omitted.) *Reed* at *2.

*Analysis*

{¶ 30} In this case, the record establishes that Barron made his request for self-representation on the second day of trial after the State had already called two of its witnesses to testify. Barron explained that he believed his trial counsel was not adequately representing him because he had recently learned that his counsel had failed to subpoena certain witnesses who Barron believed were critical to his defense. There is nothing in the record indicating that Barron had any other issue with the quality of his trial counsel's representation or that Barron had ever previously requested to represent himself.

{¶ 31} Upon review, we find that Barron's request for self-representation was untimely since it was made on the second day of trial in the middle of the State's case-in-

chief. Accordingly, Barron's request was not properly made. Although the trial court could have denied Barron's request for self-representation on that basis alone, the trial court instead decided to entertain Barron's request and determine whether Barron was knowingly, intelligently, and voluntarily waiving his right to counsel. In making that determination, the trial court first asked Barron whether he had "thought this matter through" and if Barron was "certain [he] wish[ed] to proceed without a lawyer[.]" Trial Tr., p. 141. In response, Barron replied: "I would like to have fought it with a lawyer, Your Honor. I don't feel I've had adequate time to think it all the way through; but being under duress, I do [want to go without a lawyer.]" *Id.*

{¶ 32} Later, when the trial court asked Barron if he understood that he would be required to follow the Rules of Evidence and Criminal Procedure, Barron expressed confusion about whether he would be able to subpoena his witnesses. Thereafter, the trial court explained that it would not be continuing his trial and that while Barron was allowed to subpoena witnesses, the State would be resting its case in a matter of hours and that Barron would be expected to start his case-and-chief and present those witnesses at that time. The trial court also explained that if Barron's witnesses did not appear, then Barron would have to rest his case without them.

{¶ 33} Although Barron indicated that he understood what the trial court had said, he later expressed continuing confusion about his ability to subpoena witnesses when the trial court asked him "do you understand that you will be held to the same rules as the prosecutor in this case?" Trial Tr., p. 146. After attempting to explain its position again, the trial court asked Barron a second time if he understood that he would be held to the

same rules as the prosecutor, and Barron responded: "So, can I say no?" *Id.* at 148. In response, the trial court read the question a third time and Barron responded: "And am I allowed in the negative? Can I say, no, I don't understand?" *Id.* The trial court then responded: "Well, you can answer no . . . But as long as you understand—so, if you say, no, then I'm going to keep [defense counsel] on the case." *Id.* Thereafter, Barron said: "Okay. I understand now. So, these are all the things that I have to agree to, to be eligible to represent myself?" *Id.* at 149. In response, the trial court explained that Barron simply had to be "aware" of what the court was telling him. *Id.* Following the trial court's comments, Barron indicated he understood what the trial court had said.

{¶ 34} Later in the conversation, the trial court asked Barron if he understood that, by representing himself, he would be giving up his right to claim he did not have "effective or proper legal counsel." *Id.* at 150. Although the trial court explained that Barron could not, for the purposes of trial, refer back to counsel's involvement in the case, Barron expressed continuing confusion about whether he could refer back to defense counsel's involvement. At that point in the conversation, the trial court stopped questioning Barron and said: "I can't go forward. I don't—in your interest, I don't think that there's any way you're going to be able to knowingly, intelligently, and voluntarily, willingly, waive your right to an attorney. So [defense counsel] is staying on." *Id.* at 151.

{¶ 35} Given the confusion expressed by Barron during his conversation with the trial court and the comment Barron made indicating that he had not had adequate time to think through his decision to represent himself, we find that it was reasonable and not an abuse of discretion for the trial court to deny Barron's request for self-representation.

Based on Barron's confusion, it was reasonable for the trial court to believe that a valid waiver of the right to counsel was impossible. Barron's confusion also likely indicated to the trial court that self-representation by Barron would cause further delay and impair the integrity of the trial.

{¶ 36} Denying Barron's request for self-representation was also reasonable because Barron's self-representation would not have resolved the sole issue that Barron had with his trial counsel's representation, i.e., counsel's failure to subpoena certain witnesses. Even if we were to assume that Barron knew how to subpoena witnesses, the trial court made it clear that there would be no trial continuances and that the defense only had a matter of hours before it was expected to present its witnesses. In other words, Barron's representing himself would not have resolved the subpoena issue because there was not enough time for Barron to go through the process of serving subpoenas on additional defense witnesses to secure their attendance at trial later that day.

{¶ 37} In any event, the fact remains that Barron's request for self-representation was untimely and thus not properly made. Although that was not a reason relied on by the trial court, denying Barron's request for self-representation was reasonable based on that fact alone. Therefore, for all the foregoing reasons, we conclude that the trial court did not abuse its discretion by denying Barron's mid-trial request for self-representation.

{¶ 38} Barron's first assignment of error is overruled.

**Second Assignment of Error**

{¶ 39} Under his second assignment of error, Barron contends that his felonious assault, domestic violence, and abduction offenses were allied offenses of similar import which the trial court should have merged into one conviction at sentencing. We disagree.

*Standard of Review*

{¶ 40} Appellate review of a trial court's allied-offenses ruling is de novo. *State v. Williams*, 2012-Ohio-5699, ¶ 1. Therefore, we must " 'independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.' " *Id.* at ¶ 26, quoting *State v. Burnside*, 2003-Ohio-5372, ¶ 8.

*Allied Offense Legal Standard*

{¶ 41} When a defendant's conduct supports multiple offenses, sentencing courts apply the allied offense analysis in R.C. 2941.25 to determine whether the offenses merge or whether the defendant may be convicted of separate offenses. R.C. 2941.25 provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as

to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶ 42}** " '[W]hen determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions . . . : (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?' " *State v. Earley*, 2015-Ohio-4615, ¶ 12, quoting *State v. Ruff*, 2015-Ohio-995, ¶ 31. " 'An affirmative answer to any of the above will permit separate convictions. The conduct, the animus, and the import must all be considered.' " *Id.*

### Barron's Offenses Were Dissimilar in Import

**{¶ 43}** Offenses are dissimilar in import or significance within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *Ruff* at ¶ 23. Therefore, "a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *Id.* at ¶ 26.

**{¶ 44}** In this case, the record establishes that each of Barron's offenses resulted in separate, identifiable harm to the victim. Barron's felonious assault offense was based on Barron's jabbing a kitchen knife at the victim, which resulted in a laceration to the victim's finger when the victim tried to stop Barron's attack. Barron's domestic violence offense was based on Barron smashing the victim's cellphone against the victim's head,

which damaged the victim's cellphone and left a visible red mark on the victim's head near her hairline. Barron's abduction offense was based on Barron choking the victim and placing the victim in a headlock, which restrained the victim's freedom of movement and left the victim incapacitated and unable to breathe for a period of time.

{¶ 45} Because each of Barron's offenses resulted in separate, identifiable harm to the victim, the offenses were dissimilar in import or significance and thus are not allied offenses of similar import.

*Barron's Offenses were Committed Separately*

{¶ 46} Offenses are committed separately within the meaning of R.C. 2941.25(B) if "one offense was complete before the other offense occurred, . . . notwithstanding their proximity in time and that one [offense] was committed in order to commit the other." *State v. Turner*, 2011-Ohio-6714, ¶ 24 (2d Dist.); *accord State v. Margiotti*, 2021-Ohio-1826, ¶15-16 (10th Dist.); *State v. Spurrier*, 2021-Ohio-1061, ¶ 68 (11th Dist.). In other words, "when one offense is completed prior to the completion of another offense during the defendant's course of conduct, those offenses are separate acts." *State v. Mooty*, 2014-Ohio-733, ¶ 49 (2d Dist.).

{¶ 47} In this case, Barron completed the offense of felonious assault with a deadly weapon when he jabbed the kitchen knife at the victim's stomach area. After that offense was completed, Barron then committed domestic violence by smashing the victim's cellphone against the victim's head. It is also arguable that Barron committed domestic violence prior to that when he pushed the victim into the utility closet and when he pulled

on the victim's ponytail and made her neck pop. After all those offenses were completed, Barron then committed abduction when he choked the victim and put the victim in a headlock. Although they were committed close in time, all three of Barron's offenses were committed by separate acts, which prevented them from being allied offenses of similar import.

{¶ 48} Because Barron's offenses are not allied offenses of similar import, the trial court did not err by failing to merge the offenses into one conviction at sentencing.

{¶ 49} Barron's second assignment of error is overruled.

## Third Assignment of Error

{¶ 50} Under his third assignment of error, Barron contends that his conviction for abduction in violation of R.C. 2905.02(A)(2) was not supported by sufficient evidence. Barron does not challenge the sufficiency of the evidence for his felonious assault and domestic violence convictions.

### *Standard of Review*

{¶ 51} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." *State v. Wilson*, 2009-Ohio-525, ¶ 10 (2d Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380 (1997). "When reviewing a claim as to sufficiency of evidence, the relevant inquiry is whether any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements

of the crime proven beyond a reasonable doubt."   (Citations omitted.)   *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997).   "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier-of-fact."   (Citations omitted.)   *Id.*

*Abduction*

{¶ 52} As previously discussed, Barron is challenging the sufficiency of the evidence that was used to convict him of abduction in violation of R.C. 2905.02(A)(2). Abduction under that statutory provision occurs when a person, without privilege to do so, knowingly, by force or threat, restrains the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear.   R.C. 2905.02(A)(2).

{¶ 53} The term "privilege" is defined as " "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity."   R.C. 2901.01(A)(12).   The term "knowingly" means when a person "is aware that his conduct will probably cause a certain result or will probably be of a certain nature."   R.C. 2901.22(B).   Therefore, to obtain a conviction for abduction, the State had to prove that, without any legal immunity, license or right, Barron knowingly: (1) used force or made threats directed at the victim; (2) restrained the victim's liberty; and (3) either created a risk that the victim would suffer physical harm, or caused the victim to experience fear.   *See State v. Grieshop*, 2020-Ohio-392, ¶ 17 (2d Dist.).

{¶ 54} "Force" is statutorily defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A). " 'Restraint of liberty' means 'to limit one's freedom of movement in any fashion for any period of time.' " *State v. Ahreshien*, 2021-Ohio-1223, ¶ 30 (6th Dist.), quoting *State v. Worrell*, 2005-Ohio-1521, ¶ 53 (10th Dist.). "Even . . . 'momentary' restraint may qualify as Abduction, if it produces the required risk of physical harm to, or fear in, the victim." *State v. Saylor*, 1995 WL 276103, *9 (2d Dist. May 12, 1995), quoting *State v. Messineo*, 1993 WL 3520, *6 (4th Dist. Jan. 6, 1993); *accord State v. Turner*, 2024-Ohio-684, ¶ 69 (2d Dist.). In *State v. Luciano*, 2023-Ohio-3753, (3d Dist.) the Third District Court of Appeals found that the defendant, who was convicted of abduction in violation of R.C. 2905.02(A)(2), acted by force and retrained the victim's liberty by tackling the victim and putting the victim in a chokehold until she dropped her keys. *Luciano* at ¶18.

{¶ 55} "Risk" means "a significant possibility, as contrasted with a remote possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(7), Therefore, to find that Barron created a risk of physical harm to the victim, the jury did not have to believe that Barron had harmed the victim or even that he had tried to harm her; instead, the jury simply had to find that Barron put the victim "in a position in which she faced 'a significant possibility' of suffering injury, including the possibility that she might injure herself while attempting to escape from a restraint on her liberty." *State v. Coyle*, 2018-Ohio-3194, ¶ 11 (2d Dist.), quoting R.C. 2901.01(A)(7).

*Analysis*

{¶ 56} In this case, the victim testified that Barron used both of his hands to choke her and that she used her hips to make Barron lose his balance. The victim also testified that, after she made Barron lose his balance, she attempted to get past Barron, but he grabbed her and put her in a headlock that was so tight she was unable to breathe. The victim also testified that she had to kick her feet up against the wall and make Barron lose his balance in order to free herself from the headlock.

{¶ 57} The victim's testimony established that Barron used force to restrain her freedom of movement when he choked her and put her in a headlock. The victim's testimony also established a risk of physical harm given that she could not breathe as a result of the headlock and had to use her feet to kick up against a wall to free herself from Barron's grasp. In other words, a rational fact finder could have concluded that the victim's inability to breathe and the way in which she had to manipulate her body to free herself from Barron's headlock had posed a risk of physical harm to her. A rational factfinder also could have concluded that Barron acted knowingly when he restrained the victim's liberty by choking her and putting her in a headlock. Moreover, as the victim's husband, Barron had no privilege to forcefully restrain her in such a manner. Therefore, when the victim's testimony is viewed in a light most favorable to the State, we find that there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Barron committed abduction in violation of R.C. 2905.02(A)(2).

{¶ 58} Barron's third assignment of error is overruled.

**Fourth Assignment of Error**

{¶ 59} Under his fourth assignment of error, Barron contends that all of his convictions were against the manifest weight of the evidence.  Specifically, he argues that the weight of the evidence did not establish that he was the individual who injured the victim.  We disagree.

*Standard of Review*

{¶ 60} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."  (Citation omitted.)  *Wilson*, 2009-Ohio-525, at ¶ 12 (2d Dist.). When evaluating whether a conviction was against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact " 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' "  *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence."  *State v. Adams*, 2014-Ohio-3432, ¶ 24 (2d Dist.), citing *Wilson* at ¶ 14.   A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 61} "Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of

particular witnesses." *Adams* at ¶ 24, citing *State v. Lawson*, 1997 WL 476684, *4 (2d Dist. Aug. 22, 1997). It is well established that " 'the fact finder is free to believe all, part or none of the testimony of each witness appearing before it.' " *State v. Lewis*, 2024-Ohio-756, ¶ 12 (2d Dist.), quoting *State v. Petty*, 2012-Ohio-2989, ¶ 38 (10th Dist.). (Other citation omitted.) "This court will not substitute its judgment for that of the trier of fac[t] on the issue of witness credibility unless it is patently apparent that the factfinder lost its way." (Citation omitted.) *State v. Bradley*, 1997 WL 691510, *4 (2d Dist. Oct. 24, 1997). " '[W]hen conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony.' " *State v. Sutherland*, 2022-Ohio-3079, ¶ 47 (2d Dist.), quoting *In re M.J.C.*, 2015-Ohio-820, ¶ 35 (12th Dist.); *accord State v. Pheanis*, 2015-Ohio-5015, ¶ 36 (2d Dist.). Therefore, " '[m]ere disagreement over the credibility of witnesses is not [a] sufficient reason to reverse a judgment.' " *Lewis* at ¶ 12, quoting *Petty* at ¶ 38, citing *State v. Wilson*, 2007-Ohio-2202, ¶ 24.

*Analysis*

{¶ 62} As previously discussed, Barron argues that the weight of the evidence did not establish that he was the individual who injured the victim. In support of his argument, Barron points to his own testimony asserting that he did not get into a physical altercation with the victim. Barron also relies on his testimony expressing his belief that it was one of the victim's boyfriends who had injured the victim, and that the victim had a motive to falsely accuse him of injuring her because she was trying to get him to leave

their residence. Barron further points to the fact that the evidence established that he had no defensive wounds. In addition, Barron relies on the testimony of the victim's paramour, which indicated that the victim received her injuries in a car accident the day before the alleged altercation. Lastly, Barron relies on the fact that, despite allegedly beating the victim, the evidence established that the victim stayed with him after the altercation and walked with him to his grandmother's house. Based on this evidence, Barron claims the jury lost its way in finding him guilty of the offenses in question.

**{¶ 63}** Barron's manifest weight argument fails because the jury was not required to credit his testimony, which was self-serving, or the testimony of the victim's paramour, which was refuted by the detective's testimony indicating that there was no record of the victim's being involved in a car accident. The jury was free to believe the victim's testimony that Barron was the individual who had committed the physical abuse in question. Because the victim's testimony was supported by physical evidence such as the bloody knife in the wall, the damaged cellphone, and the victim's injuries, we cannot say the jury lost its way or created a manifest miscarriage of justice by crediting the victim's testimony. As previously discussed, a conviction is not against the manifest weight of the evidence simply because the jury chose to believe the State's version of events.

**{¶ 64}** Barron's claim that the victim's actions immediately after the physical altercation were inconsistent with her being physically abused by him is not persuasive, because the jury was free to weigh that fact against other evidence that supported the victim's version of events, i.e., the bloody knife in the wall, the damaged cellphone, and

the victim's injuries. Moreover, the jury was free to credit the testimony of the State's domestic violence expert, who explained that everyone responds differently to domestic violence, that there is no one way to respond, and that victims "are not always sure exactly what to do[.]" Trial Tr., p. 26- 27.

{¶ 65} For all the foregoing reasons, we cannot say that the jury lost its way and created a manifest miscarriage of justice by finding Barron guilty of felonious assault with a deadly weapon, domestic violence, and abduction. Accordingly, Barron's convictions were not against the manifest weight of the evidence.

{¶ 66} Barron's fourth assignment of error is overruled.

## Fifth Assignment of Error

{¶ 67} Under his fifth assignment of error, Barron claims that he received ineffective assistance of counsel due to his trial counsel's failure to subpoena certain witnesses who Barron believed were critical to his defense. We disagree.

{¶ 68} This court reviews alleged instances of ineffective assistance of trial counsel under the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which has been adopted by the Supreme Court of Ohio in *State v. Bradley*, 42 Ohio St.3d 136 (1989). Pursuant to those cases, in order to prevail on an ineffective assistance claim, Barron must show that his trial counsel rendered deficient performance and that counsel's deficient performance prejudiced him. *Strickland* at paragraph two of the syllabus; *Bradley* at paragraph two of the syllabus. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of

counsel. *Strickland* at 697.

{¶ 69} To establish deficient performance, Barron must show that his trial counsel's performance fell below an objective standard of reasonable representation. *Id.* at 688. In evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings." *State v. Jackson*, 2005-Ohio-6143, ¶ 29 (2d Dist.), citing *Strickland.*

{¶ 70} To establish prejudice, Barron must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Bradley* at 142, quoting *Strickland* at 694.

{¶ 71} When reviewing ineffective assistance claims, we will not second-guess trial strategy decisions. *State v. Mason*, 82 Ohio St.3d 144, 157 (1998); *Strickland* at 689. It is well established that " 'trial counsel is allowed wide latitude in formulating trial strategy[.]' " *State v. Collins*, 2011-Ohio-4475, ¶ 15 (2d Dist.), quoting *State v. Olsen*, 2011-Ohio-3420, ¶ 121 (2d Dist.). Therefore, "[d]ebatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available." *State v. Conley*, 2015-Ohio-2553, ¶ 56 (2d Dist.), citing *State v. Cook*, 65 Ohio St.3d 516, 524-525 (1992).

{¶ 72} As previously discussed, Barron claims his trial counsel performed deficiently because he failed to subpoena certain witnesses to testify on his behalf. This failure, however, falls within the purview of trial strategy and therefore cannot form the basis of an ineffective assistance claim. *See State v. Woodard*, 2022-Ohio-3081, ¶ 73 (2d Dist.), citing *State v. Conway*, 2006-Ohio-2815, ¶ 113 ("[c]ounsel's decision to call a witness is a matter of trial strategy"); *State v. Treesh*, 90 Ohio St.3d 460, 489 (2001) ("counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court"). (Other citations omitted.) Because even a debatable decision concerning trial strategy cannot form the basis of a claim for ineffective assistance of counsel, *Conley* at ¶ 56, Barron's claim that his trial counsel was ineffective for failing to subpoena his witnesses lacks merit.

{¶ 73} Barron's fifth assignment of error is overruled.

## Conclusion

{¶ 74} Having overruled all five assignments of error raised by Barron, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .


LEWIS, J. and HUFFMAN, J., concur.