[Cite as *State v. Deloney*, 2025-Ohio-2458.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| STATE OF OHIO, | : | APPEAL No. | C-240009 |
| | | TRIAL No. | B-1303726 |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| | | JUDGMENT ENTRY | |
| JOHN DELONEY, | : | | |
| Defendant-Appellant. | : | | |

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**

**Enter upon the journal of the court on 7/11/2025 per order of the court.**

**By:**_____
      **Administrative Judge**

[Cite as *State v. Deloney*, 2025-Ohio-2458.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                    :     APPEAL NO.   C-240009
                                         TRIAL NO.    B-1303726
    Plaintiff-Appellee,      :

 vs.                             :

                                         *O P I N I O N*
JOHN DELONEY,                     :

    Defendant-Appellant.     :


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: July 11, 2025


*Connie Pillich*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Arenstein & Gallagher* and *Elizabeth Conkin*, for Defendant-Appellant.

CROUSE, Judge.

{¶1}    More than a decade after John Deloney was charged with aggravated robbery and aggravated murder in connection with a 2013 shooting at Cosmic Pizza in Hartwell, Ohio, a jury found him guilty as charged. Deloney now appeals, claiming errors in the proceedings below concerning his competency to stand trial, his absence from most of the trial proceedings, the alleged bias of two jurors, the denial of his request to represent himself, and the effectiveness of his trial counsel. For the reasons set forth below, we overrule all eight of Deloney's assignments of error and affirm the judgment of conviction.

## I. BACKGROUND

{¶2}    While some of Deloney's assignments of error implicate the merits of the State's evidence and the trial proceedings, most implicate events and rulings that took place during pretrial proceedings or outside the hearing of the jury. We will therefore begin by (A) summarizing what transpired leading up to the trial and outside the jury's presence before (B) turning to the evidence presented at trial, followed by (C) the verdicts and sentences. We will reserve discussion of voir dire for our section addressing Deloney's juror-bias claims.

### A. Indictment, Pretrial & Procedural Issues

{¶3}    On June 21, 2013, a Hamilton County grand jury returned an indictment charging John Deloney with the June 15 aggravated murder and aggravated robbery of R.E., in violation of R.C. 2903.01(B) and 2911.01(A)(1). Both counts carried firearm specifications. The thrust of the State's theory was that, shortly before 6:00 p.m. on June 15, 2013, Deloney had entered Cosmic Pizza (a small pizza restaurant in Hartwell, Ohio), brandished a firearm at R.E. (the owner), and attempted to rob him. The State alleged that, during the chaos that followed, Deloney shot R.E. several times in the

back, pointed his weapon at O.E., R.E.'s wife, and then fled the scene. R.E. died before first responders could arrive.

{¶4} Although Cincinnati Police had Deloney in custody when the State secured its indictment, ten years passed before Deloney's case would reach a jury. This delay was caused in part by attempts to determine whether the State was prohibited from imposing the death penalty on Deloney under *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the Constitution prohibits the execution of certain persons with intellectual disabilities.

{¶5} In September 2015, the trial court found that Deloney had an intellectual disability that precluded the death penalty under *Atkins*. The court made this determination under the standard that was set forth in *State v. Lott*, 2002-Ohio-6625, in response to the *Atkins* decision. The State appealed, and this court reversed the trial court's *Atkins*/*Lott* determination in *State v. Deloney*, 2017-Ohio-9282 (1st Dist.) ("*Deloney I*").

{¶6} But in 2019 the Ohio Supreme Court repudiated *Lott* and imposed a new standard for *Atkins* determinations in *State v. Ford*, 2019-Ohio-4539. The trial court ordered Deloney retested under the new *Ford* standard. In August 2022, after more than a year of delay caused by the COVID-19 pandemic and Deloney's own noncompliance with testing, the trial court found that Deloney had a qualifying intellectual disability under *Ford* and was therefore ineligible for the death penalty. The State appealed again, but this time, we affirmed. *State v. Deloney*, 2023-Ohio-1013 (1st Dist.) ("*Deloney II*").

{¶7} In August 2015, Deloney also moved to suppress a video of his interrogation by and confession to the police, arguing that it was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). The trial court denied that motion—

4

roughly one month before entering its first *Atkins* finding.[1]

**{¶8}** The trial court and Deloney's counsel also expressed concerns about Deloney's competency to stand trial on at least three occasions during his ten-year pretrial detention. And the trial court found him competent on three occasions: in January 2014, June 2015, and September 2020. Deloney was nevertheless committed on several occasions to Summit Behavioral Center "for maintenance of competency." No such commitment occurred following the trial court's last competency finding.

**{¶9}** Throughout the proceedings, and despite being represented by appointed counsel, Deloney submitted a miscellany of pro se filings to the trial court, including motions to dismiss the indictment on the grounds that the court lacked jurisdiction over him, that the indictment was defective, that the grand jury had indicted him unlawfully, and that his trial had been unjustifiably delayed; affidavits raising arguments generally associated with sovereign citizens; and letters, styled as civil complaints, purporting to sue various public officials and individuals involved in his criminal proceedings. Deloney also filed several pro se appeals and petitions to this court, all of which were dismissed.

**{¶10}** Deloney appears to have had six different attorneys during the course of his proceedings. Several of his first four attorneys appear to have withdrawn or were fired because of issues working with Deloney. As his trial date neared, Deloney's relationship with his fifth and sixth attorneys (Norman Aubin and Richard Wendel) seems to have fractured, too. At a hearing in February 2021, Deloney attempted to terminate his counsel, but insisted he was not attempting to "say [he] was representing [him]self." Rather, Deloney said that he "d[id] not consent to any counsel." The trial

---

[1] The video of the confession was later played for the jury, and a description of it can be found in Part I.B.2.

court denied Deloney's motion and noted that it "believe[d] Mr. Aubin, in particular, has been doing everything he possibly can do to represent Mr. Deloney, including securing the individuals who would be testifying at the *Atkins* hearing."

**{¶11}** Deloney again inquired about removing his counsel at a hearing in July 2023. The court told him that he could file such a motion, but that it was unlikely to be granted at so late a date.

**{¶12}** In October 2023, the month before his trial was to begin, Deloney again filed a motion to remove his counsel, which the trial court denied at the final pretrial conference. Deloney stated that he "d[id]n't feel safe around" his attorneys and "d[id]n't want them on [his] case."

**{¶13}** After his October hearing, Deloney filed a document, captioned "Restraining order," in which he again alleged that he did "not feel safe around" his attorneys, and said, "I will defend myself If they Get around me, meaning I will punch kick or anything to get they Guys away from me. I do not want to But I Will please take this In consideration." (Capitalization sic.) This motion, too, was denied.

**{¶14}** Given his threats of violence and refusal to be near his attorneys, the trial court arranged for Deloney to appear at his trial via Zoom. However, the court brought Deloney into the courtroom on each of the first two days of voir dire to ask Deloney whether he wished to appear in person or by Zoom. Both days, Deloney said that he would prefer to be present in person, but not while his attorneys were there. Because the court would not let Deloney fire his attorneys at this point, Deloney said that he preferred to attend via Zoom. His attorneys said they would attempt to check in with him on breaks.

**{¶15}** Initially, a Zoom station was set up in the jail library. But during the first day of voir dire, Deloney disappeared from the camera frame—apparently, he had gone

6

to the bathroom and refused to return. After that, the court arranged for Deloney to appear by Zoom from within the courthouse. To avoid possible taint, the court dismissed the jury array from day one and brought in a new array for day two.

**{¶16}** On the third day of voir dire, Deloney requested to represent himself and proceed pro se. The trial court denied this request, citing its concerns that the motion was untimely, that it was "an attempt to further delay the proceeding," and that Deloney had been found to have an intellectual disability for *Atkins* purposes. After expressing his displeasure with this outcome, Deloney again opted to appear by Zoom.

**{¶17}** During the lunch break on that third day, however, the trial court and counsel were informed that Deloney had fallen down a series of stairs while his hands were cuffed behind his back. A sheriff's deputy who witnessed the fall described the fall as "severe" and apparently unintentional. Deloney was taken to the hospital, and the trial court dismissed the jurors for the second half of the day.

**{¶18}** Before the jury panel entered the courtroom on day four, Deloney, who had been discharged from the hospital, was brought into the courtroom in a wheelchair. When asked whether he wished to attend the proceedings, Deloney said that he "d[id]n't want to be present at all" because he was "in a lot of pain." Deloney said that it was "hurting for [him] to sit down" in the courtroom, such that he could "barely sit down," and claimed that he "couldn't even walk to get down" to the courtroom that morning. The court noted that it didn't "have any report from any physician that indicate[d] that [Deloney] ha[d] any injury." When asked, defense counsel, too, said he did not "have any medical information other than what the Court ha[d]."

**{¶19}** Defense counsel moved for a mistrial, but the trial court denied the

7

motion, noting that Deloney appeared fully capable of understanding the proceedings and conversing with the court. The trial court offered to take breaks to accommodate Deloney's injury and allow him to be present, but Deloney refused. Deloney returned to the Zoom room in the courthouse library.

{¶20} The trial court then inquired into Deloney's condition with medical staff, who informed the court that Deloney had "only been given the recommendation for nonprescription pain medications and perhaps some anti-inflammatories." Deloney's attorneys informed the trial court that they had spoken with their client and suggested that, if voir dire were to proceed, they would simply waive his presence and allow him to return to the jail and lie down. The trial court agreed to this plan. The court noted on the record "that Mr. Deloney's actions, while not definitively intentional in falling down the stairs yesterday, caused his voluntary absence from the trial," and found that "the current status is such that we can proceed in his absence."

{¶21} The trial court brought Deloney into the courtroom in his wheelchair at the start of each subsequent day of the proceedings to ask him whether he wished to be present in person, appear by Zoom, or return to his cell. And each time, when the trial court declined to continue the proceedings or grant a mistrial, Deloney requested to return to his cell. The trial court deemed each of Deloney's requests to return to his cell to be a voluntary waiver of his right to be present at trial. Neither Deloney nor his counsel offered evidence to suggest that Deloney's injuries were anything more than bruises and abrasions, nor that he was prescribed anything more potent than over-the-counter anti-inflammatory and pain-relief medications. The State proffered video from the jail purporting to show Deloney walking without the benefit of a wheelchair.

### B. Evidence at Trial

{¶22} The interactions described so far occurred outside of the presence of the

8

jury, who were frequently admonished not to consider Deloney's absence during the trial.

**{¶23}** At trial, the State's theory was simple: Deloney attempted to rob Cosmic Pizza to pay his girlfriend's bail, and, in so doing, shot and killed R.E. when R.E. attempted to escape. The State supported this theory with, among other things, extensive surveillance video from the restaurant and nearby properties, R.E.'s widow's narration of events and contemporaneous identification of Deloney from a photo lineup, testimony regarding the course of the investigation, Deloney's recorded confession, and multiple forms of forensic identification evidence.

### 1. Narrative of the Shooting & Aftermath

**{¶24}** The State established what transpired in Cosmic Pizza on June 15, 2013, through (a) video taken from surveillance cameras inside and around the restaurant, and (b) the eyewitness testimony of R.E.'s widow, O.E., who had been present.

**{¶25}** *Surveillance Video.* Cincinnati Police Officer Alice Stallcup testified by video deposition about how she had processed raw surveillance video from Cosmic Pizza and from the neighbors' exterior surveillance cameras. She used these sources to create two composite videos—one following the shooter and one following the victim. Both composite videos and the original raw footage were admitted into evidence. The video from a neighbor's surveillance camera had audio, but the Cosmic Pizza surveillance video did not.

**{¶26}** The video footage depicts a man parking a red SUV outside of Cosmic Pizza. The man exits the vehicle, enters the restaurant, and speaks to R.E. at the front counter. The man and R.E. have several interactions as the man wanders around the waiting area and occasionally leans on the counter. Meanwhile, O.E. appears to be in the kitchen behind R.E., making pizzas. At some point, it appears the man convinces

R.E. to let him into a side hallway, which runs parallel to the kitchen area, but was closed off to the waiting area by a door. R.E. walks to the back of the kitchen and into the side hallway, peering into a room at the opposite end of the hallway from the waiting-room door. R.E. then walks down the side hallway and unlocks the waiting-room door, opening it for the man to enter.

{¶27} The man follows R.E. down the hall and pulls out a weapon. R.E. rushes out of the hallway and into the kitchen, as he and O.E. unsuccessfully attempt to shut the door behind him. The man forces his way into the back of the kitchen area, as R.E. flees toward the front, vaulting over the front counter and into the waiting area. The man pursues, running toward the counter and firing his weapon once while R.E. is turned toward him. R.E. then opens the door to exit the restaurant as the man fires three more shots. The sound of the shots is audible on the neighbor's security-camera footage.

{¶28} At this point, the man heads back into the kitchen. He disappears from any camera's frame for a short time, though a video shows the hand of someone off-screen manipulating the cash register. O.E., who has been crouched behind a counter at the rear of the kitchen, then attempts to sneak into the back hallway on her hands and knees. The man rushes toward her and points his weapon at her. R.E., who has made it outside and staggered onto his neighbor's yard, cries out, "Help!" before collapsing onto the grass. The sound seems to draw the man's attention from O.E. The man then walks outside and looks around, before getting into the red SUV he had parked across the street and driving away.

{¶29} The man's face is visible throughout large portions of the video. No one else appears on the footage from inside the restaurant—only O.E., R.E., and the man.

{¶30} *O.E.'s Narrative.* O.E. testified to her own recollection of the

shooting and the events that followed. She described how a man came into Cosmic Pizza while she and her husband were working around 6:00 p.m. The man walked up to R.E. at the counter and ordered a meat lover's pizza. O.E. got a good look at the man and described him as a "a big, tall guy."

**{¶31}** O.E. said that, after the man had placed his order, R.E. walked the ticket back to her. When he did so, R.E. informed O.E. that the man had a gun and told her to pull the silent alarm. She looked up, saw the weapon, and pulled the silent alarm.

**{¶32}** As the man went to the cooler, O.E. testified, R.E. entered the kitchen through the door at the back and attempt to pull the door shut behind him. The man kicked the door in, however, and followed R.E. into the kitchen with his gun drawn. The man walked past O.E. to the cash register but was unable to open it. R.E. then jumped over the front counter. The man responded by firing his weapon at R.E., who "got on the floor." O.E. recounted how, at that point, her children, who were in another room, began making noise or trying to enter the room. The man apparently turned to O.E. and said, "Fucker, shut them up."

**{¶33}** O.E. described how, while the man was distracted, R.E. ran to the front door. The man noticed this and shot R.E. several times, but R.E. still managed to open the door and run out of the shop. O.E. testified that the man proceeded to "walk[] out, like, very normal." O.E. followed the man out the door and saw him drive away. She then searched for R.E. and found him lying on the ground. O.E. yelled for help, hoping someone would stop and help her.

**{¶34}** *Immediate Aftermath.* Margot Madison, a neighbor who lived near Cosmic Pizza, testified that she saw O.E. as she was driving home and stopped her car. O.E. told Madison that R.E. had been shot, and Madison called 9-1-1. Madison's husband arrived and went to R.E., who was bleeding in the grass. Madison testified

that, upon learning that O.E. and R.E. had children, she went into the restaurant, kicking one of the bullet casings on the floor as she did. She found the children and took them to a neighbor's home.

**{¶35}** Cincinnati Police Sergeant John Hubbard testified that he was dispatched to Cosmic Pizza in response to a silent "duress alarm." When he arrived on the scene five or six minutes after 6:00 p.m., he saw a male lying in the grass next door to Cosmic Pizza with another male atop him, and "one female [with] her hands wrapped around another female consoling her." He testified that R.E. already appeared to be dead.

### 2. Investigation & Arrest

**{¶36}** *Facial Recognition.* Officer Steven Alexander, a criminalist with the Cincinnati Police Department, testified that, as he was assisting Officer Stallcup in collecting surveillance footage, he obtained still images of sufficient quality to run through facial-recognition software. Alexander testified that he did so, and that the software yielded a match: John Deloney.

**{¶37}** *Lineup Identification.* Testimony from both O.E. and Cincinnati Police Officer Terry McGuffey disclosed how, two days after the shooting, O.E. identified a photo, supposedly of Deloney, from a photo lineup. McGuffey testified that he had administered a blind, sequential photo lineup, and had not been told anything about the case or which photo was the suspect's. McGuffey's testimony and contemporary documentation describe how, upon seeing picture number four (purportedly Deloney), O.E. immediately began sobbing and said, "That's him." According to McGuffey, O.E. said that she was "100 percent" sure of her pick.

**{¶38}** O.E. could not identify Deloney in the courtroom as he was not present, and the defense would not stipulate that the lineup photo depicted Deloney. The State

introduced the lineup photo into evidence and the jury had the opportunity to view Deloney through the monitor on their first day of voir dire—as well as in the police interrogation video.

**{¶39}** *Search for Deloney.* Detective Keither Witherell, testified about the investigation and arrest of Deloney. After Deloney was identified, investigators learned that Deloney was connected to a woman named Tonya, who was variously listed as his wife or girlfriend, and who drove a red Chevrolet Equinox, which was consistent with the vehicle Deloney drove away from Cosmic Pizza. At the time of the shooting and investigation, Tonya was being held in an Indiana jail. Witherell went to Tonya's last-known address. A young woman at that address showed him a text message that said something to the effect of, "What did the police want?" With her permission, Witherell called that number and spoke with someone who identified themselves as "John." John said he was nearby and would come and speak with the officers. Witherell testified that he believed the voice to be John Deloney's.

**{¶40}** Although "John" never came to meet with Witherell at Tonya's home, the officer used the phone number to track Deloney to Indianapolis, Indiana, where Deloney's family lived.

**{¶41}** During his investigation, Witherell learned that Deloney had an identical twin brother, James Deloney. While in Indianapolis, Witherell interviewed James, whom he described as looking similar to John, but weighing some 75 pounds less and with a noticeable scar on his lip. A photograph of James was admitted into evidence.

**{¶42}** With the help of the Indianapolis Police Department and the United States Marshals Service, Cincinnati Police secured Deloney's surrender and took him into custody.

**{¶43}** *Interrogation & Confession.* After Deloney's surrender, Witherell read Deloney his *Miranda* rights and, once Deloney had signed a waiver, proceeded to interrogate him. That interrogation was recorded on video and played (with some redactions) for the jury. Initially, Deloney claimed that he had not been at Cosmic Pizza on the day of the shooting, because he had been in Indiana attempting to bail Tonya out. But as the officers confronted him with evidence from and information about the shooting, Deloney's story changed.

**{¶44}** Deloney gave the officers an evolving series of explanations of what had brought him into Cosmic Pizza and how R.E. had been shot. In the narrative's final form, Deloney told the officers that his drug-dealing friend, "Chris," had given Deloney a gun and told him to scare R.E. with it to get the money he needed. But when Deloney tried to do just that, he said that R.E. started "flipping out" and "act[ing] like he was getting ready to attack." Deloney told the officers that he pulled the trigger, but "didn't expect the gun to shoot" because he had been told the safety was on. When R.E. "kept yelling help help help," Deloney said he "went out of [his] body and just started shooting."

### 3. Other Evidence at Trial

**{¶45}** *Palmprint Comparison.* In addition to the testimony and video described above, the State introduced testimony of Officer Alexander regarding his use of forensic palmprint identification to link Deloney to the shooting. Alexander described how, in reviewing the surveillance footage, he had noticed the shooter resting his hand on a menu on Cosmic Pizza's counter for a significant period of time. Alexander, who was qualified by the trial court to testify as an expert in fingerprint and palmprint examination, described how he had used chemical staining to reveal a palmprint on that menu. He then compared that palmprint to a "known" left palmprint

taken from John Deloney while in custody in July 2015. Alexander further testified that the two prints matched closely and that he "would never expect this much corresponding information" (i.e., similarities in the prints) to come "from different sources" (i.e., different people). Ultimately, Alexander testified that the print on the menu matched Deloney "to the exclusion of anybody else, including an identical twin." To document the comparison, Alexander created a "latent identification chart," which was admitted into evidence.

{¶46} *Other Evidence.* The State introduced photos from the search of the red Chevrolet Equinox through Officer Alexander, including images of prescription pill bottles with John Deloney's name on them found in that vehicle. The State also called a firearms toolmark examiner, Kevin Lattyak, and the coroner who had examined R.E.'s body, Dr. William Clark Ralston, III, neither of whose testimony is relevant for purposes of this appeal.

### C. Conviction & Sentence

{¶47} The defense put on no significant evidence of its own, instead electing to put the State to its burden. In closing arguments, defense counsel suggested that the State had not proven that Deloney was the man in the video. However, their primary argument was that the State had failed to prove Deloney guilty of robbery, so that the jury could not find Deloney guilty of *aggravated* murder—even if it did find him guilty of murder.

{¶48} The next day, the jury returned a verdict of guilty on both the aggravated-murder and aggravated-robbery counts, as well as both firearms specifications. The trial court imposed an aggregate sentence of 33 years to life in prison, crediting Deloney for the 3,823 days he had already served awaiting his trial.

{¶49} This appeal timely followed.

## II. ANALYSIS

**{¶50}** Deloney raises eight assignments of error. Because several concern overlapping issues, we address these assignments of error in groups and out of order.

### A. Assignments of Error 1 & 7: Competency to Stand Trial

**{¶51}** Deloney's first and seventh assignments of error both pertain to his competency to stand trial. In his first assignment of error, Deloney contends that the trial court erred by failing, sua sponte, to conduct a competency hearing. In his seventh assignment of error, Deloney contends that the trial court violated his right to due process of law by allowing the jury to convict him while not competent to stand trial.

**{¶52}** The Due Process Clause of the Fourteenth Amendment protects a criminal defendant's right not to be convicted unless he is mentally competent to stand trial. *See State v. Berry*, 1995-Ohio-310, ¶ 21. In general, a defendant is constitutionally competent to stand trial only if he "has 'a rational as well as factual understanding of the proceedings against him'" and "'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.'" (Emphasis deleted.) *Indiana v. Edwards*, 554 U.S. 164, 170 (2008), quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam).

**{¶53}** In Ohio, competency determinations are governed by R.C. 2945.37-.39. Competency findings require not one, but two decisions by the trial court. First, the court must determine whether to order a competency hearing. *See* R.C. 2945.37(B). Second, once a hearing is granted, the trial court must determine whether the defendant is, in fact, competent to stand trial. Deloney's first assignment of error goes to the former, while his seventh assignment of error goes to the latter. Because these two determinations involve different considerations and are reviewed under different standards, we address each in turn.

16

*1. Assignment of Error 1: Failure to Conduct a Hearing*

**{¶54}** Deloney's first assignment of error contends that "the record created sufficient doubt as to Mr. Deloney's competence to stand trial," so that "the trial court abused its discretion and violated Mr. Deloney's Fifth Amendment right to due process by failing to conduct a competency hearing, *sua sponte.*"[2]

**{¶55}** In criminal cases, "the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial." R.C. 2945.37(B). "[W]here the issue of the defendant's competency to stand trial is raised prior to the trial, a competency hearing is mandatory" under the plain text of R.C. 2945.37(B). *State v. Bock*, 28 Ohio St.3d 108, 109 (1986); *accord State v. Mills*, 2023-Ohio-4716, ¶ 13. But even when no party has raised the issue, due process requires that a trial court hold a competency hearing whenever it receives information or observes behavior that "create[s] a sufficient doubt of [the defendant's] competence to stand trial." *Drope v. Missouri*, 420 U.S. 162, 180 (1975); *see also Pate v. Robinson*, 383 U.S. 375, 385-386 (1966). This obligation is ongoing, even with respect to a defendant who was previously found to be competent. *See Drope* at 181.

**{¶56}** A trial court is therefore obligated to hold a competency hearing in two circumstances: (1) when "a request is made before trial" by either the prosecutor or the defense under R.C. 2945.37(B), and (2) when "the record contains sufficient indicia of incompetence that an inquiry is necessary to ensure that the defendant is accorded his rights to due process and a fair trial," regardless of whether the trial has started or whether any party has raised the issue. *State v. Montgomery*, 2016-Ohio-5487, ¶ 55.

---

[2] The assignments of error in Deloney's brief were printed in all capital letters. We have normalized their capitalization whenever they are quoted in this opinion.

**{¶57}** We recognize that a trial court enjoys some discretion in determining whether to order a competency hearing on its own motion or on a request made after the trial has begun. *See State v. Schwarm*, 2017-Ohio-7626, ¶ 20 (1st Dist.), citing *State v. Berry*, 72 Ohio St.3d 354, 360 (1995). But a court necessarily abuses that discretion when it chooses not to hold such a hearing in the face of sufficient, objective indicia of incompetency. *See Schwarm* at ¶ 25.

**{¶58}** We begin our assessment in this case by noting that Deloney was found competent to stand trial on three different occasions—in January 2014, June 2015, and September 2020. Deloney's first assignment of error challenges the trial court's failure to order *another* competency hearing, and not the validity of those prior determinations at the time they were entered.

**{¶59}** These prior determinations place Deloney's case on a very different footing from *Drope*, on which Deloney heavily relies. The defendant in *Drope* was never provided a competency hearing, despite (1) pretrial motions, one of which included an attached psychiatric report, requesting a hearing, (2) testimony from the defendant's wife (the victim) that he had exhibited bizarre behaviors in the past, including rolling down the stairs, and had attempted to choke her to death the week prior to trial, and (3) the defendant's attempt to shoot himself between the first and second days of witness testimony, causing him to be hospitalized. *Drope*, 420 U.S. at 164-167. The trial court declined to grant a mistrial or continuance in the defendant's absence. *Id.* at 166. The trial proceeded, and the jury returned a guilty verdict. *Id.* at 167.

**{¶60}** The United States Supreme Court vacated the conviction. *Id.* at 183. It held that the motions, reports, testimony, and suicide attempt, taken together, provided sufficient indicia suggesting the defendant was incompetent to stand trial,

such that "the correct course was to suspend the trial until such an evaluation [of competency] could be made." *Id.* at 181. Further, the Court noted that the defendant's absence from trial had deprived the trial court of the chance "to observe him in the context of the trial and to gauge from his demeanor whether" he could meet the competency test. *Id.*

**{¶61}** In this case, unlike in *Drope*, the trial court had a prior competency determination to serve as a baseline of how Deloney acted while competent. Competency is, of course, fluid; it can ebb and flow over long periods in a cell. It is therefore entirely possible for a defendant like Deloney to be found competent to stand trial one day, and then cease to be so months, weeks, or even days later. But, while a prior competency finding cannot be determinative of a defendant's competency at any later point in time, it nevertheless changes the character of the competency inquiry. In a situation like *Drope*, in which no prior competency finding exists, the trial court is left to ask whether every new fact about the defendant suggested a lack of competency. But in a case like this one, the court asks whether any *change* or *new data* suggest that the defendant has *lost* the competency he was previously found to have.

**{¶62}** Deloney points to several record facts that he contends called his competency into question: (1) the quantity and content of Deloney's pro se motions, (2) the withdrawal of Deloney's first four attorneys, (3) Deloney's adoption of sovereign-citizen arguments, (4) Deloney's refusal to cooperate with his attorneys and examining experts, (5) testimony adduced at the *Atkins* hearing regarding Deloney's intellectual disability, and (6) the suggestion that Deloney injured himself to avoid trial.

**{¶63}** Several of these facts do not suggest any significant change from Deloney's September 2020 competency evaluation. For example, the withdrawal of

Deloney's first four attorneys long predated the 2020 competency determination, as did 12 of the more than 30 pro se filings that Deloney now suggests prove his incompetence. And the affidavits suggesting that Deloney held beliefs associated with "sovereign citizens" were not merely part of the record at the time of the 2020 competency hearing—they appear to have been part of the reason the trial court ordered the 2020 competency evaluation.[3]

**{¶64}** That leaves Deloney's alleged self-harm, Deloney's repeated noncompliance, and the new evidence regarding Deloney's intellectual disability.

**{¶65}** Deloney's fall did not necessarily offer "sufficient indicia" that Deloney had ceased to be competent to stand trial. First, we note that the fall would only suggest the sort of decompensation associated with loss of competency if Deloney had, in fact, caused it. But the trial court never found that Deloney caused his own injuries by throwing himself down the stairs. When the eyewitness and Deloney's counsel expressed the belief that "it look[ed] like it really was a real fall," the trial court agreed. And the following day, the trial court said that the fall was "not definitively intentional." The trial court did suggest that the fall had "caused [Deloney's] voluntary absence from the trial." But, read in context, this statement simply suggested that the court thought Deloney was using his injuries from the fall to justify absenting himself from trial, despite being physically capable of attending. Only the State insisted the fall was self-inflicted.

**{¶66}** The trial court was far better positioned to assess the cause of Deloney's fall. Because it did not believe that Deloney had intentionally thrown himself down the

---

[3] In addition, we have held on at least one prior occasion that a defendant's "fringe views"— including a "professed sovereign-citizen belief system"—do not themselves "create[] a genuine doubt concerning [a defendant's] competency and necessitate[] the court to sua sponte order a hearing on the issue." *State v. Thomas*, 2019-Ohio-132, ¶ 19 (1st Dist.).

stairs, and because no record evidence clearly contradicts that conclusion, we decline to second guess the trial court's finding on this point.

{¶67} Nor did Deloney's uncooperativeness with his attorneys require the court to order yet another competency hearing. Four attorneys had already quit Deloney's case by the time of the 2020 competency finding, several because of difficulties getting Deloney to cooperate and submit to examinations. Deloney's refusal to cooperate with counsel numbers four and five was hardly a deviation from the baseline. Even Deloney's statements that he did not feel safe with his attorneys were consistent with the persistent distrust of those appointed to represent him, which Deloney reiterated throughout the proceedings.

{¶68} Further, competency turns on whether "the defendant is *incapable* of . . . assisting" counsel in his defense. (Emphasis added.) R.C. 2945.37(G); *accord Dusky*, 362 U.S. at 402 (defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding"). Deloney was clearly *unwilling* to help in his defense, but there were not "sufficient indicia" to suggest that any "present mental condition" rendered him "*incapable* of" doing so. Deloney had previously been found competent despite similar noncompliance. And although Deloney threatened violence toward his attorneys, nothing in the record suggested he intended to act upon his threats, or that defense counsel feared he would do so.

{¶69} But Deloney contends that new testimony from his *Atkins/Ford* hearing suggested that his lack of cooperation may have been the result of deficits in cognitive processing. At that hearing, Dr. David T. Smith offered testimony linking obstructive behaviors, which Deloney had long displayed, with intellectual and cognitive deficiencies, which the court and counsel had long known he had. There was thus nothing new in Dr. Smith's testimony in this respect, except insofar as Dr. Smith made

explicit that Deloney's intellectual disability likely contributed to his obstructive behaviors. Even so, no party or witness raised concerns about Deloney's competency to the trial court around the time of the *Atkins/Ford* hearing. Under these facts, we cannot say that the trial court erred by failing sua sponte to order a new competency hearing following the *Atkins/Ford* hearing.

**{¶70}** Indeed, the fact that defense counsel, who presumably had the most familiarity with Deloney's capacity to assist in his own defense, requested no further competency hearings after 2020 distinguishes this case from *State v. Were*, 2002-Ohio-481. Admittedly, the facts of *Were* bore many similarities to Deloney's case: both defendants expressed seemingly paranoid beliefs that their attorneys were working against them; both filed repeated, frivolous pro se motions; both refused to speak with experts; both drove their counsel to seek to withdraw; and both were suspected of using these behaviors to delay trial. *Id.* at ¶ 11, 12, 16.

**{¶71}** But *Were* concerned a defendant who had *never been afforded a competency hearing at all*, despite "defense counsel continually rais[ing] the issue of [his] competency." *Id.* at ¶ 9-11, 15. Indeed, the defendant in *Were* had an undoubted right to a hearing—the State simply argued that the error was harmless. *Id.* at ¶ 13. But in Deloney's case, the trial court held three competency hearings, and defense counsel expressed no significant concern about Deloney's competency to stand trial following the 2020 report, hearing, and finding.

**{¶72}** In light of the prior competency determinations, Deloney has not shown that there were sufficient indicia of incompetency on this record to require the trial court, sua sponte, to order another hearing. We therefore overrule Deloney's first assignment of error.

### 2. *Assignment of Error 7: Conviction while Incompetent*

**{¶73}** In his seventh assignment of error, Deloney contends that "the trial court abused its discretion in finding Mr. Deloney competent to stand trial" and "violated Mr. Deloney's Fifth Amendment right to Due Process when it allowed the conviction of a legally incompetent man."

**{¶74}** Deloney has not adequately identified which of the trial court's actions he wishes us to review under this assignment of error. As an appellate court, our principal task is to assess whether the trial court's decisions were erroneous or improper. Thus, an appellant is required to "identify in the record the error on which the assignment of error is based." App.R. 12(A)(2). Unless an appellant "explain[s] to us why it believes the trial court erred"—and when it did so—we generally cannot "conduct the appropriate analysis." *Deloney II*, 2023-Ohio-1013, at ¶ 21 (1st Dist.).

**{¶75}** We can certainly review a finding of competency to determine whether "there is some reliable and credible evidence supporting that finding." *State v. Neyland*, 2014-Ohio-1914, ¶ 33. But Deloney has not directed us to any particular competency determination that he is challenging. Even if we assume that he is referring to his most recent competency determination in September 2020, his briefs provide no substantive argument as to how the trial court erred in accepting the parties' stipulation to the expert evaluation finding Deloney competent to stand trial.

**{¶76}** Deloney also contends that "the trial court should have ordered a competency evaluation when it was inclined to believe Mr. Deloney intentionally fell down a flight of concrete stairs while his arms were handcuffed behind him, in an apparent effort to delay the trial." But as discussed in the previous section, the trial court did not find that Deloney intentionally threw himself down the stairs. Deloney's 2023 fall tells us nothing about the propriety of his 2020 competency evaluation.

**{¶77}** Because Deloney has failed to "identify in the record" any valid "errors on which [his seventh] assignment of error is based," *see* App.R. 12(A)(2), his seventh assignment of error is overruled.

### B. Assignment of Error 2: Defendant's Absence from Trial

**{¶78}** In his second assignment of error, Deloney contends that "[t]he trial court abused its discretion and violated Mr. Deloney's Due Process rights under the Fifth and Fourteenth Amendments and the Confrontation Clause of the Sixth Amendment when it denied his request for a mistrial and conducted the trial in his absence."

**{¶79}** "One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial." *Illinois v. Allen*, 397 U.S. 337, 338 (1970), citing *Lewis v. United States*, 146 U.S. 370 (1892). To protect this right, Crim.R. 43(A)(1) provides that "the defendant must be physically present at every stage of the criminal proceeding and trial, including the impaneling of the jury, the return of the verdict, and the imposition of sentence, except as otherwise provided by these rules." A defendant may, however, appear remotely under certain circumstances, Crim.R. 43(A)(2) and (3), and may waive their right to be present by voluntarily absenting themselves after proceedings have begun, Crim.R. 43(A)(1).

**{¶80}** We have previously held that whether a defendant's absence is voluntary under Crim.R. 43(A) is "'an issue of fact.'" *State v. Hurt*, 2024-Ohio-3115, ¶ 57 (1st Dist.), quoting *State v. Carr*, 104 Ohio App.3d 699, 703 (2d Dist. 1995). We review such factual findings "for clear error," and so will not disturb them if supported by competent, credible evidence. *Id.*, citing *State v. Jackson*, 2015-Ohio-2473, ¶ 55 (9th Dist.).

24

{¶81} We begin by noting that Deloney does not challenge his appearance by Zoom during the days prior to his fall. Rather, he asserts that the trial court's decision to conduct the trial in his absence after his fall, rather than granting a continuance or mistrial, violated his rights.

{¶82} Deloney points us to a case with facts he says "are substantially similar to those in the case at bar": *State v. Sinclair*, 2005-Ohio-6011 (8th Dist.). The defendant in *Sinclair* overdosed on antidepressant medications—possibly in a suicide attempt. *Id*. at ¶ 14, 18. Following the overdose, the defendant "would not come up for trial." *Id*. at ¶ 15. He was "drowsy and incapacitated," "display[ed] a lack of understanding and awareness," and exhibited "bizarre and inexplicable behavior," and "'voiced suicidal thoughts.'" *Id*. at ¶ 14, 16-17. The Eighth District held that, under those facts, the trial court had erred by proceeding with the trial in the defendant's absence without "conduct[ing] a more thorough investigation into appellant's mental state" or "grant[ing] even a one-day continuance." *Id*. at ¶ 19.

{¶83} Deloney asserts that, like *Sinclair*, the "court continued with the trial in his absence," even though "the trial court and all trial counsel believed it likely Mr. Deloney had acted intentionally to harm himself." But, as we have already explained in addressing Deloney's first assignment of error, the trial court never found that Deloney's fall was self-inflicted.

{¶84} Nevertheless, the voluntariness of a defendant's absence from trial does not turn on whether they suffer from a malady that was self-inflicted or caused by mental illness. The only question is whether the defendant's failure to appear in court was ultimately "the 'product of [his] own free choice and unrestrained will.'" (Alterations sic.) *State v. Maynard*, 2012-Ohio-2946, ¶ 42 (10th Dist.), quoting *State v. Carr*, 104 Ohio App.3d 699, 703 (2d Dist. 1995). Detention by investigating

authorities, for example, can render a defendant's absence from trial involuntary. *See State v. Kirkland*, 18 Ohio App.3d 1, 3 (8th Dist. 1984). On the other hand, a defendant's "decision to attend the birth of his child instead of appearing for his murder trial" has been held to be "a voluntary absence." *Maynard* at ¶ 42; *accord State v. Spinks*, 79 Ohio App.3d 720, 733 (8th Dist. 1992) (defendant's absence to attend her son's graduation was voluntary).

**{¶85}** In *Sinclair*, the defendant overdosed on antidepressants, an act that, the court seemed to suspect, may have been caused by mental illness rather than volitional choice. In consequence, the physical and psychological effects of that overdose clearly prevented Sinclair from being present and cognizant at his trial. Thus, the Eighth District held that, without further investigation by the trial court on the record, Sinclair's absence was likely involuntary.

**{¶86}** But in this case, the trial court did not appear to think Deloney had inflicted his own injury, and, upon examination, found that Deloney's decisions not to attend were voluntary. Deloney was in custody and was brought into court every day, where the trial court asked him if he wanted to be present. Each day Deloney asked to remain in his cell, citing the pain from or medications for the injuries from his fall. Because Deloney clearly made the decision to return to his cell, the question before us is simply whether that decision was somehow involuntary, i.e., whether it had ceased to be a product of Deloney's "free choice and unrestrained will." *See Carr* at 703.

**{¶87}** Deloney contended that the pain he experienced from his injuries prevented him from attending trial. The trial court, however, was clearly concerned that Deloney was playing up his injuries to further delay his trial. The court thus took significant steps to inquire into Deloney's condition by conferring with medical providers and jail staff. From these meetings, the trial court reported that Deloney had

been discharged from the hospital to the jail the day after his fall, and that he had been given nothing but over-the-counter pain medications and anti-inflammatories.

{¶88} While these facts did not lead the trial court to believe that Deloney's pain was keeping him from being present, the court nevertheless remained open to further evidence that Deloney's injuries required bedrest, specialized treatment, or consciousness-altering pharmacological interventions. The day after the fall, for example, when the defense requested a continuance, the trial court asked defense counsel if there was "any doctor that you're aware of" to testify to Deloney's inability to participate. When defense counsel said there was not, the court responded that, given the circumstances of the trial and the fall, it would not grant a continuance.

{¶89} Several days later, the trial court again said it had "checked with the jail, with the medical staff there" and that they had "indicate[d] no loss of consciousness, no concussion, no prescription medications, no ongoing treatment." Deloney never provided affirmative evidence or testimony to corroborate the allegedly incapacitating character of his pain.

{¶90} The State, however, submitted a video that purported to show Deloney in the jail, some time after his fall, walking unaided. The State seemed to suggest that this proved defendant had been exaggerating his claims of injuries. We have reviewed the video and note that it is not quite as compelling as the State suggests. Deloney appears to walk with a limp and occasionally braces himself against the wall. However, in the absence of other evidence to corroborate Deloney's claims of debilitating injury, we must acknowledge that the jail video tends to undermine some of his gravest claims about the extent of his injuries.

{¶91} Further, there is no evidence that either Deloney's injury or his medications rendered him unable to participate in the proceedings. The trial court

noted on the first day after his fall that there was "no indication that there's anything that would cause [Deloney] to be unable to understand or comprehend what was happening." On the last day of testimony, Deloney did assert that he was "not mentally or physically able to comprehend what's going on" and "probably just need[ed] to rest." However, the trial court responded by pointing out the lack of evidence, apart from Deloney's own statements, suggesting this to be the case. The trial court noted that there had been no reports of "loss of consciousness," "no concussion," and "no note from a physician saying that [Deloney couldn't] focus or attend." When Deloney said that jail staff were giving him "a lot of medicine" that made him "very drowsy," the court responded that it "ha[d] no confirmation of any prescription medicines." The court explicitly told Deloney, "I understand that you have asked to see a doctor. I understand that there are some treatments that are going on, but I don't have any indication from any medical professional that you can't attend."

**{¶92}** Deloney was present by Zoom at the commencement of the trial. After his fall, the trial court received no evidence to suggest Deloney's injuries would prevent him from attending the trial, or that his fall or medications had disabled him from participating. The trial court thus did not clearly err by finding that Deloney's absence was voluntary and "continuing the trial to . . . the verdict." *See* Crim.R. 43(A)(1). Deloney's second assignment of error is overruled.

### C. *Assignments of Error 3 & 4: Juror-Bias*

**{¶93}** Deloney's third and fourth assignments of error allege that the bias of two jurors, Sp*** and R***, deprived him of the right to a fair trial protected by the Sixth Amendment.

**{¶94}** In his third assignment of error, Deloney asserts that "defense counsel were ineffective in failing to move for the excusal of [Jurors Sp*** and R***] for cause

28

and/or for failing to utilize peremptory strike on either of the prospective jurors, thereby denying Mr. Deloney his Sixth Amendment right to counsel."

{¶95} The Sixth Amendment's guarantee of counsel in criminal proceedings includes the right to the effective assistance of counsel. Thus, we will reverse a conviction based upon counsel's ineffective assistance where (1) "counsel's performance was deficient," and (2) that "deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *State v. Conway*, 2006-Ohio-2815, ¶ 95, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). These general standards have specific meanings in the juror-bias context. To show deficiency, the defendant "must demonstrate that defense counsel's performance was objectively unreasonable in light of counsel's failure to question or strike the jurors at issue." *State v. Bates*, 2020-Ohio-634, ¶ 25. And to show prejudice, Deloney "must show that a juror was actually biased against him." (Cleaned up.) *Id.*

{¶96} In his fourth assignment of error, Deloney contends that "the trial court abused its discretion and violated Mr. Deloney's constitutional right to a fair trial when it failed to, sua sponte, dismiss Jurors Sp**** and R*** for cause." We review the trial court's failure to strike a juror for an abuse of discretion. *See State v. Smith*, 80 Ohio St.3d 89, 105 (1997). And because defense counsel did not request that Sp*** or R*** be struck for cause, we review the trial court's failure to do so only for plain error. *See id.* (noting that defendant "waived any potential error by failing to challenge the prospective jurors at trial"); *State v. Jones*, 91 Ohio St.3d 335, 338-339 (2001).

{¶97} Although Deloney must demonstrate that the jurors were "actually biased" to prevail, "actual bias," in this context, does not only mean *personal* bias, as when a juror has strong feelings for or against a particular party's witnesses. It can also refer to a juror's more general inability to decide a case in accordance with the

29

law, as "when a juror expresse[s] views on the death penalty that 'would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."'" *Bates* at ¶ 26, quoting *Morgan v. Illinois*, 504 U.S. 719, 728 (1992). Thus, a juror unable to grasp and apply the applicable legal standards meant to protect criminal defendants can be subject to removal for cause because of bias. *See Franklin v. Anderson*, 434 F.3d 412, 427 (6th Cir. 2006) ("Jurors who cannot apply the law are not impartial."); *see also accord Wainwright v. Witt*, 469 U.S. 412, 423 (1985) (referring to jurors unable to "conscientiously apply the law and find the facts" as "biased").

{¶98} *Franklin* is illustrative. There, the Sixth Circuit granted a writ of habeas corpus to an Ohio prisoner, one of whose jurors "made at least five statements indicating that she did not understand that [the defendant] was not required to prove himself not guilty." *Id.* Even after three attempts by the trial judge to rehabilitate her, "she still insisted with her last statement that the defendant had to be proven innocent." *Id.* at 428. This, the court concluded, was sufficient to show that the defendant had been denied the right to a fair trial.

{¶99} If a juror indicates a measure of bias, but, once confronted, provides assurances of her own impartiality, a reviewing court should accept those assurances— provided they are not subsequently undermined. *See Bates*, 2020-Ohio-634, at ¶ 36. However, as the Ohio Supreme Court has recognized, "[s]peculation that defense counsel, the prosecution, or the trial judge *could have sought* such reassurance of impartiality from a juror who admitted bias cannot nullify the prejudicial impact of that juror's participation in the trial." (Emphasis in original.) *Id.*

### 1. Juror R***

{¶100} Deloney alleges that Juror R*** expressed an inability to properly

assume Deloney's innocence. He cites the following colloquy from voir dire:

[DEFENSE COUNSEL]: . . . Do you think that simply because someone files a complaint or an indictment against someone—and an indictment is how this case started, you heard that from the Judge. Do you think that simply because an indictment is filed against someone that that person is automatically guilty of any crime?

[JUROR R***]: No. I mean, I don't want to prejudge him.

[DEFENSE COUNSEL]: All right. Would you think it's likely that that individual is guilty of a crime?

[JUROR R***]: I wouldn't say "guilty." There's got to be a reason somebody filed a complaint against him. But I would say he's not guilty until I hear all the evidence.

[DEFENSE COUNSEL]: Okay. And I'm not even saying beyond a reasonable doubt, certainly, because that's certainly the highest standard that we have, right?

[JUROR R***]: Right.

[DEFENSE COUNSEL]: But would you say it's likely or that an individual—well, you know, there's a reason that person is here, right? Is that a fair statement? Go ahead.

[JUROR R***]: That's a tough one. I don't know. He's got to be doing something to be here, but I don't know. Innocent people are brought in also, so I don't know. I don't even—I can't answer that, honestly.

[DEFENSE COUNSEL]: Okay. Would it be fair to say that you should hear some evidence—

[JUROR R***]: Sure.

[DEFENSE COUNSEL]: —before that—before you would make any determination like that?

[JUROR R***]: Sure.

[DEFENSE COUNSEL]: Okay. Because I would submit to you that maybe a clean slate, or a blank slate, is probably a good way to describe it.

[JUROR R***]: I think somebody has said that.

[DEFENSE COUNSEL]: Is that fair? Sure.

[JUROR R***]: Um-hmm.

[DEFENSE COUNSEL]: Okay.

Juror R*** was not further rehabilitated on this issue.

{¶101} The end of this colloquy makes clear that Juror R*** did not demonstrate an inability to impartially apply the law such as would constitute actual bias. We do not deny that R***'s initial statement—that "[t]here's got to be a reason somebody filed a complaint against" the defendant—warrants concern. It is imperative, in our system of criminal adjudication, that a defendant not forfeit the presumption of innocence based on an indictment alone. But in this case, R***'s later statements ameliorated such fears. R***, upon reflection and of her own volition, acknowledged that "[i]nnocent people are brought in also." She then agreed that she should hear evidence before deciding whether the person before her was one of those innocent people, and that it would be best to write on a blank slate. While R*** did not specifically say she could be fair, her statements *did* suggest that she would remedy the particular unfairness about which Deloney now complains. *Compare Anderson,* 434 F.3d at 428; *Miller v. Webb*, 385 F.3d 666, 675 (6th Cir. 2004).

**{¶102}** Under these facts, we cannot say the trial court plainly abused its discretion in seating Juror R***, nor that she demonstrated an inability to faithfully apply the presumption of innocence so as to render her inclusion prejudicial for *Strickland* purposes.

### 2. *Juror Sp****

**{¶103}** Deloney also contends that the following voir-dire exchange suggested that Juror Sp*** improperly felt that Deloney should prove his own innocence—rather than demanding the State prove his guilt:

[DEFENSE COUNSEL]: Would you say that it is appropriate that the burden of proof is on the State of Ohio to prove somebody guilty?

[JUROR SP***]: If they're the ones that are bringing the charges against someone, yes.

[DEFENSE COUNSEL]: Okay. Should a defendant—someone charged with a crime—be forced to prove their innocence to you?

. . .

[JUROR SP***]: . . . I don't think they need to be forced to prove it, but it's good to be able to hear their side of the matter as well.

. . .

[DEFENSE COUNSEL]: Okay. All right, so—and let me ask you about that. Do you think that—let's say the State of Ohio were to put on their case, put on evidence; put a witness on, that sort of thing.

[JUROR SP***]: Yes.

[DEFENSE COUNSEL]: Should the Defendant be forced to also present a case to you?

[JUROR SP***]: Not—again, not forced. I don't like that word,

but I think both sides need to explain why they're here and—

[DEFENSE COUNSEL]: Okay.

[JUROR SP***]: Again—

[DEFENSE COUNSEL]: Fair enough.

[JUROR SP***]:—to draw the conclusion, we need to hear from both sides.

[DEFENSE COUNSEL]: It's something that you would probably like to hear.

[JUROR SP***]: Yes.

[DEFENSE COUNSEL]: All right. So let me ask you this. If the state were to put on their case and put on evidence, maybe the Defendant might not put on any evidence independent of what the state has done. How would that make you feel?

[JUROR SP***]: I wouldn't feel like I'm getting all the facts about the case.

[DEFENSE COUNSEL]: You would not feel that you're getting all the facts? Okay. All right.

So you do believe that Mr. Deloney doesn't—or Mr. Deloney is presumed innocent, right?

[JUROR SP***]: Yes.

[DEFENSE COUNSEL]: Okay. If—you don't feel he has to prove any innocence to you, right?

[JUROR SP***]: Yes.

[DEFENSE COUNSEL]: But you—nevertheless, you'd want him to. Is that fair, or is that kind of getting at what we're talking about?

[JUROR SP***]: I would just like to hear from him.

[DEFENSE COUNSEL]: Okay. Fair enough.

So let me ask you this, if the State of Ohio started their case and they said, "we have no evidence to present," and they sat down, and then the Defense said—stood up and said, "we have, no evidence to present," and sat down, all right? What would your verdict have to be?

[JUROR SP***]: That there's nothing to look at, then?

[DEFENSE COUNSEL]: All right. Not guilty?

[JUROR SP***]: I don't think I would be able to say guilty or not guilty.

[DEFENSE COUNSEL]: Okay. Not be able to say anything. Okay. What if I were to tell you that if Mr. Deloney is presumed innocent, he would remain innocent right?

[JUROR SP***]: Yes.

[DEFENSE COUNSEL]: Okay. All right. But if there's no—if there's no evidence to indicate guilt or no evidence against him, I would submit to you, perhaps, that a not guilty would be appropriate.

[JUROR SP***]: If there's no evidence, then, yes, a not guilty would be appropriate.

[DEFENSE COUNSEL]: Okay. Fair enough.

For example, if you had to vote right now on whether Mr. Deloney is guilty or not guilty, what would your vote be?

[JUROR SP***]: I don't know. I just—

[DEFENSE COUNSEL]: Okay. That's a fair answer—all right—because you've heard nothing to indicate that he would be guilty. All

right. And I appreciate that.

As with Juror R***, there was no subsequent rehabilitation of Juror Sp*** regarding the presumption of innocence or the parties' relative burdens.

{¶104} Whether effective counsel would have peremptorily struck Juror Sp***—and whether the failure to do so prejudiced Deloney—poses a more challenging question than in the case of Juror R***. To be sure, defense counsel's questions were not the model of clarity. And as a result, Sp***'s answers seemed to fluctuate. Sp***'s early testimony suggested that she would have difficulty voting to acquit a defendant who failed to put on any evidence of his own. She believed, as she put it, that "both sides need to explain why they're here." And she initially said that, if neither side put on evidence, she would be uncomfortable returning *any* verdict.

{¶105} But after further questioning from defense counsel, Sp*** acknowledged that if there were "no evidence" from either party, "then, yes, a not guilty would be appropriate." And Sp***'s tepid answers to some of defense counsel's hypotheticals can be easily forgiven as the product of simple confusion. We suspect that many people would falter if asked, before a trial had begun and with no evidence before them, what they would do if they "had to vote right now" on whether the defendant was "guilty or not guilty."

{¶106} Nevertheless, Sp*** never truly disavowed her desire that Deloney put forward an affirmative case. Her suggestion that she "would just like to hear from" Deloney lingered. Indeed, she suggested her insistence on hearing from Deloney came from her desire to "get[] all the facts about the case."

{¶107} We are thus left with an ambiguous record. This is not a case like *Franklin*, where the court repeatedly sought to rehabilitate a single juror for the same issue regarding the State's burden, and where the juror repeatedly failed to

comprehend their error. *Compare Franklin*, 434 F.3d at 426-427. There, the juror's undeterred and unambiguous misunderstanding of the law posed the rare case in which the "cold record" was "so extensive and so persuasive" that it "outweigh[ed] our presumptive deference" to "the assessment of the trial judge, who hears the prospective juror's tone of voice and sees her demeanor." *Id.* at 427.

{¶108} Rather, this is a case of ambiguity that shows *why* we give "presumptive deference" to the trial court and counsel in this context. Where language in the "cold record" is ambiguous, "tone of voice" and "demeanor" may well be the deciding factors. The trial court and trial counsel were much better positioned to judge Sp***'s tone and demeanor, and to discern whether her ambiguous responses were rooted in a desire to hear Deloney out or an inability to faithfully apply the presumption of innocence. Indeed, counsel may have had reason to suspect the former, in light of Sp***'s responses to some of his later questions, which showed a greater sensitivity to the risks of systemic racial bias in policing and the criminal justice system than many others in the jury array.

{¶109} On the record before us, it is far from plain that the trial court abused its discretion in failing to strike Juror Sp*** sua sponte. Likewise, we cannot say that trial counsel were constitutionally deficient for failing to strike her (peremptorily or for cause) based on her ambiguous responses, or that those responses exhibited the "actual bias" necessary to show prejudice in this context.

{¶110} Deloney's third and fourth assignments of error are therefore overruled.

### D. *Assignment of Error 6:* Faretta

{¶111} In his sixth assignment of error, Deloney asserts that "the trial court's denial of Mr. Deloney's request to represent himself was an abuse of discretion that violated Mr. Deloney's Sixth Amendment right of self-representation."

37

{¶112} The United States Supreme Court has held that the Sixth Amendment's right to counsel also "implies a right of self-representation"—one with deep "roots in English legal history." *Faretta v. California*, 422 U.S. 806, 821 (1975). That right was incorporated against the states by the Fourteenth Amendment. *See id.* at 818. A trial court's improper denial of a defendant's right to represent themselves constitutes a structural error, which is "per se reversible." *Neyland*, 2014-Ohio-1914, at ¶ 71.

{¶113} Neither this court nor the Ohio Supreme Court appears to have clearly articulated what standard we apply when reviewing a trial court's decision to deny a defendant's request to represent himself. Several of our sister districts, however, have suggested that where the *Faretta* right "is not invoked until *after* the trial has begun," the proper standard is abuse-of-discretion review. (Emphasis added.) *State v. Okoronkwo*, 2023-Ohio-48, ¶ 16 (11th Dist.); *see also*, *e.g.*, *State v. Gordon*, 2004-Ohio-2644, ¶ 30 (10th Dist.) ("[W]here a criminal defendant challenges the denial of a tardy request for self-representation, the court reviews the trial court's ruling under the standard for abuse of discretion."). By contrast, "[i]t is unclear . . . what standard of review would apply . . . where the right was first invoked on the morning of trial, before voir dire commenced." *State v. Owens*, 2011-Ohio-2503, ¶ 8 (9th Dist.). At least one court appears to have considered the defendant's motivation for making the request in determining what standard of review applies. *See Okoronkwo* at ¶ 17 (applying the de novo standard of review because defendant did not seek to delay proceedings by continuing the trial date).

{¶114} In this case, however, we need not worry about what standard of review applies because, under any standard, the trial court permissibly denied Deloney's motion as untimely.

{¶115} As "*Faretta* itself and later cases have made clear," the "right of self-

representation is not absolute." *Edwards*, 554 U.S. at 171. To exercise the right, a defendant must "'voluntarily and intelligently elect[] to do so.'" *Id.* at 170, quoting *Faretta*, 422 U.S. at 807; *accord State v. Gibson*, 45 Ohio St.2d 366 (1976), paragraph one of the syllabus (defendant may proceed pro se "when he voluntarily, and knowingly and intelligently elects to do so"). The assertion of the right to represent oneself "must be clear and unequivocal." *Neyland*, 2014-Ohio-1914, at ¶ 72. Mere passing references or oblique suggestions will not rebut the "presumption against waiver of the right to counsel." (Cleaned up.) *See State v. Obermiller*, 2016-Ohio-1594, ¶ 29.

**{¶116}** In his reply brief, Deloney points to the following colloquy from the start of the third day of voir dire as his clear and unequivocal invocation:

> THE DEFENDANT: I would like for Mr. Wendel and Norm Aubin to remove their self and I would like to become co-counsel myself and proceed as my own attorney.
>
> THE COURT: So we're at the point in the trial where they are your appointed attorneys. I do not feel comfortable, based on the record in this case, with you proceeding pro se.
>
> I think that in this situation they have to remain as your attorneys. I'm not going to remove them as your attorneys because I'm not going to appoint any new attorneys.
>
> THE DEFENDANT: I'm not asking for a new attorney. I'm asking to be—go—be be [sic] pro se.
>
> THE COURT: So you're asking to proceed pro se.
>
> THE DEFENDANT: Yes. That's what I'm asking right now in this court.

We hold that this request was certainly "clear and unequivocal."

**{¶117}** But *when* the defendant makes their self-representation request matters, too. As the Ohio Supreme Court has made clear, a "trial court may deny a defendant's request for self-representation if it is untimely made." *See Neyland* at ¶ 76. For example, in *State v. Cassano*, 2002-Ohio-3751, ¶ 40, the Ohio Supreme Court held a defendant's assertion of his *Faretta* rights to be untimely where the request to proceed pro se was made just three days before trial was to begin.

**{¶118}** In this case, the trial court did not err by rejecting Deloney's request to represent himself under *Faretta*, because that request came even later than the untimely request made in *Cassano*. Deloney's clear and unambiguous *Faretta* invocation came on the third day *after* the start of voir dire. At an absolute minimum, a trial court has the discretion to deny a defendant's request for self-representation made after the start of voir dire, where nothing prevented the defendant from lodging that request prior to trial. And in this case, we know the trial court was motivated to deny Deloney's request in part due to timing concerns, as its oral ruling referenced "the procedural standing of this case" and "where we are in this case."

**{¶119}** We therefore hold that Deloney's motion to represent himself was untimely, and so overrule his sixth assignment of error.

### E. *Assignments of Error 5 & 8: Failure to Exclude Evidence*

**{¶120}** Deloney's fifth and eighth assignments of error both argue that his trial counsel were ineffective for failing to secure the suppression or exclusion of certain portions of the State's evidence against him. Deloney's fifth assignment of error argues that, "[w]here the trial court found Mr. Deloney so intellectually disabled as to be ineligible for the death penalty, defense counsels' failure to ask leave to re-open his motion to suppress his statements to the police denied Mr. Deloney his Sixth

Amendment right to effective assistance of counsel." His eighth assignment of error contends that "defense counsel were ineffective in failing to object to Officer Alexander's testimony regarding the results of the facial recognition search as inadmissible hearsay, thereby denying Mr. Deloney his Sixth Amendment right to counsel." We address these two assignments of error together.

{¶121} As we have already explained in addressing Deloney's third assignment of error, we may reverse a conviction based upon a deprivation of a defendant's right to the effective assistance of counsel only if the defendant shows (1) his "counsel's performance was deficient," and (2) that "deficient performance prejudiced the defense so as to deprive the defendant of a fair trial." *See Conway*, 2006-Ohio-2815, at ¶ 95, citing *Strickland*, 466 U.S. at 687.

{¶122} In this case, we need not determine whether these alleged errors rendered counsel's performance deficient, because Deloney has failed to offer any argument on the prejudice prong—an issue on which he bore the burden. While we could end our analysis there, our independent review of the record has not revealed a reasonable probability that either the suppression of Deloney's confession or the exclusion of the facial-recognition testimony would have altered the outcome of the trial.

{¶123} No one contests that the individual who walked into Cosmic Pizza on that day in 2013 and was captured on the security camera footage shot R.E., or that the shots caused R.E. to die. The only real issues at trial were (1) whether the person on the video was John Deloney, and (2) whether the murder was committed while the killer was "purposely committing or attempting to commit" aggravated robbery.

{¶124} The identification of Deloney as the shooter was well-supported by the evidence, even if the jury had never seen the confession or heard the testimony about

the facial-recognition match.

**{¶125}** *First*, O.E. and Officer McGuffey both told the jury how O.E. had identified John Deloney in a photo lineup. The evidence revealed that O.E. had ample time to see the shooter's face while he lingered in her pizza parlor prior to the attack, and only two days had passed since the incident. Further, the lineup appeared to have been administered with proper protective procedures—Officer McGuffey testified that he had administered a "blind" and sequential photo lineup, in order to avoid incidentally biasing O.E.'s response. When O.E. saw Deloney's face in the sequence, McGuffey testified that she instantly became emotional, began crying, and identified him as the attacker with "100 percent" certainty—all facts attested by contemporary documentation on the lineup form.

**{¶126}** *Second*, the jury heard how Deloney's palmprint matched a print left on a menu from Cosmic Pizza. The jury could see for themselves how, in the surveillance footage, the shooter had rested his palm at a particular spot on a particular menu in Cosmic Pizza. They heard how Officer Alexander had extracted a palmprint from that menu and compared it with a known print from Deloney. From this comparison, Officer Alexander testified that the palmprint left by the shooter matched Deloney's with a degree of similarity sufficient to exclude the possibility of any other suspect— even his twin. The jury could see the comparison chart for themselves, and defense counsel mounted no significant attack on Alexander's expertise, the science underlying his assessment, or the validity of his conclusions.

**{¶127}** Given this and other circumstantial evidence identifying Deloney as the man on the security footage, we cannot say that there was a reasonable probability that the exclusion of either the facial-recognition evidence or the confession (or both) would have altered the result of the proceedings.

{¶128} Likewise, the record does not suggest that the introduction of the confession likely altered the jury's resolution of whether Deloney was "purposely committing or attempting to commit" an aggravated robbery. In its closing arguments, the defense contended the State had failed to prove any attempted robbery, and that the jury therefore could convict Deloney only on the lesser-included charge of murder—not aggravated robbery and aggravated murder.

{¶129} While Deloney did seem to confess to going to Cosmic Pizza to rob them in his interrogation, it was not the only evidence to that effect. Most significantly, O.E. testified that Deloney "tried to open the register drawer." And surveillance video showed someone touching the register at a point when R.E. had already leapt into the waiting area and O.E. appeared to be hiding behind a counter. Thus, the jury would have logically inferred, consistent with O.E.'s eyewitness testimony, that it was Deloney—the only other person known to be in the restaurant—whom the camera caught interacting with the register. And the inference that Deloney was trying to steal money from the till would have further been bolstered by the lack of any alternative explanation for why Deloney might have entered Cosmic Pizza with a gun and wished to shoot R.E. In the absence of evidence to the contrary, we do not find a reasonable probability that the jury would have reached any other conclusion.

{¶130} Because Deloney has failed to explain how he was prejudiced by the introduction of either his confession or the facial-recognition testimony, and because our own review of the record suggests that their exclusion would not have changed the outcome of the trial, we overrule Deloney's fifth and eighth assignments of error.

### III. CONCLUSION

{¶131} Having overruled all eight of Deloney's assignments of errors, we affirm the judgment of conviction.

Judgment affirmed.

**KINSLEY, P.J.,** and **BOCK, J.,** concur.